MARY J. BADGER, Appellant, *v.* ALFRED C. BADGER et al., Respondents.

In an action brought for admeasurement of dower, defendants denied plaintiff's marriage with B, , the deceased. No formal marriage or express agreement between the parties was proved. Plaintiff's evidence showed cohabitation continued for a long period of time and up to the death of B., characterized by general repute and by conduct and conversation tending to show an intercourse matrimonial instead of mere-

tricious. This was under an assumed name, however, and in another locality ; among his relatives and friends the deceased occupied rooms and lived as a bachelor, his connection with plaintiff being unknown. Defendants were permitted to prove, under objection and exception, by numerous witnesses, who were the friends and acquaintances of B., but who did not know the plaintiff and were ignorant of her cohabitation with B., that he was reputed to be a bachelor. *Held* error; that the repute thus proved did not tend to explain or show the character of the cohabitation ; that while it was proper to prove that B., among his friends and relatives, lived as a single man, that he was reputed to be unmarried among those who thus saw him and before whom nothing had occurred to raise the question, was mere hearsay, which explained nothing.

The repute, proper to be shown in such case, cannot go beyond the range of knowledge of the cohabitation ; within that range, to contradict the repute of marriage which to be effective must be general, a divided repute may be shown, *i. e.*, that among some friends and acquaintances, the connection was reputed to be illicit, not matrimonial.

*Clayton* v. *Wardell* (4 N. Y. 230), *Vincent's Appeal* (60 Penn. St. 228), *Lyle* v. *Ellwood* (L. R., 19 Eq. Cas. 98), distinguished.

Plaintiff offered in evidence a letter, the body of which was in the handwriting of the deceased, but signed by plaintiff as " Mrs. Mary Baker," the latter being the assumed name under which they lived together. The letter was written to a nephew of hers, congratulating him upon his marriage and containing such expressions as these : "We wish you much joy." " We expected a visit from you and your wife." The nephew also testified that B. asked him afterward if he received the letter. The letter was excluded. *Held* error ; that it was to be regarded as the joint act of plaintiff and B., and its signature was a representation that she was a married woman ; the letter itself was material on that point, and was admissible as part of the *res gestæ*.

W., a witness for plaintiff, testified to a conversation between himself and B., at a house where the sister of the latter lived, in which he stated that he had been married, but it wouldn't do to let " the women " know it. The defendants' counsel asked the witness if he did not have another conversation with B. in the presence of the sister of the latter, in which he stated that " he was not married ; " this the witness denied. The sister was thereafter called as a witness for the defense, and was asked as to such a conversation. This was objected to generally ; the court admitted it to contradict W. " and not as a declaration of deceased." *Held*, that the evidence was relevant and material, and so a general objection was not tenable ; also held that defendant was not bound by the answer of W., as the evidence was not collateral but bore upon the issue ; and that the sister was a competent witness (Code, § 829), as it was not a personal transaction between her and deceased.

Under the rule that a connection confessedly illicit in its origin or shown

to have been such, will be presumed to retain that character until some change is established, it is not essential in order to establish such a change, to show the precise time or occasion thereof; it is sufficient if the facts show that a change must have occurred transforming the illicit intercourse into cohabitation matrimonial in its character.

It appeared that plaintiff when about seventeen years of age returned to her home with an infant of whom there was no acknowledged father. When this child was two or three years of age, the mother and B. were living together as husband and wife, and so continued to live until his death. *Held*, that the evidence did not warrant a conclusion that the cohabitation was illicit in its origin.

(Argued March 16, 1882; decided April 11, 1882.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department, entered upon an order made September 13, 1881, which affirmed a judgment in favor of defendants, entered upon a decision of the court on trial at Special Term.

This action was brought for admeasurement of dower.

The material facts are stated in the opinion.

*Geo. B. Ely* for appellant. The proof of acknowledgment of marriage, matrimonial cohabitation, habit and repute was so clear and for so long a period as to establish the marriage, and the burden of disproving it was upon defendants. (*Hynes* v. *McDermot*, 82 N. Y. 46; *Brinkley* v. *Brinkley*, 50 id. 199; Best on Evidence, § 349; Bishop on Marriage and Divorce, § 457; *Piers* v. *Piers*, 2 House of Lords Cases ,331, head-note; *Morris* v. *Davies*, 5 C. & F. 163; *Cunningham* v. *Cunningham*, 2 Dow. (House of Lords) 506; 1 Taylor's Evidence, § 801; 1 Greenleaf's Evidence, § 195; *Dickinson* v. *Coward*, 1 B. & A. 679; *Inglis* v. *Spence*, 1 Crompt. M. & R. 436.) No testimony was competent other than such as would have been competent had this been an action between the plaintiff and the deceased where the fact of marriage was in issue. (1 Greenleaf's Evidence, § 107; *Westfield* v. *Warren*, 3 Halst. [N. J. Law] 249.) The relations of the plaintiff and the deceased during a period of thirty-five years, under the name of Baker, do not overturn the presumption of innocence. (*In re Snook*, 2 Hill,

575; *David* v. *Williamsburg Fire Ins. Co.*, 83 N. Y. 265; *Rex* v. *Burton-upon-Trent*, 3 M. & S. 537; *Ferrie* v. *Public Administrator*, 3 Bradf. 167; *Vincent's Appeal*, 60 Pa. [10 P. F. Smith] 228; *Brinkley* v. *Brinkley*, 50 N. Y. 184; *Van Tuyl* v. *Van Tuyl*, 57 Barb. 235; *The Myra Clark Gaines Cases* in the Sup. Ct. U. S., 6 How. 550; 12 id. 472; 24 id. 553; *The Dysart Peerage Case*, decided in House of Lords March 7, 1881, Appeal Cases [Part IV], 489.) The law presumes in favor of innocence. (*Aronegary* v. *Vaigalie*, 6 Appeal Cases, 364, 371; *Fox* v. *Bearlock*, 44 Law Times [N. S.], 509; L. R., 16 Ch. Div. 429; *Caujolle* v. *Ferrie*, 23 N. Y. 90, 104; *Ferrie* v. *Public Administrator*, 4 Bradf. 112°; *People* v. *Bartholf*, 24 Hun, 272; *Chamberlain* v. *Chamberlain*, 71 N. Y. 429; Bishop on Marriage and Divorce, § 457.) The rule of evidence in the case at bar is not different from what it would have been in an action between the plaintiff and the deceased where the issue was marriage or no marriage. (Greenleaf's Ev., §§ 107, 104, 123; *Evans* v. *Morgan*, 2 C. & J. 453; *Westfield* v. *Warren*, 3 Halst. [N. J. Law] 251; *Van Tuyl* v. *Van Tuyl*, 57 Barb. 235; *Cunningham* v. *Cunningham*, 2 Dow. [House of Lord Cases] 502.) The defendant could not by Whitbeck, on cross-examination, prove the declarations of the deceased. (*Van Tuyl* v. *Van Tuyl*, 57 Barb. 235; *Westfield* v. *Warren*, 3 Halst. [N. J. Law] 249.)

*S. M. Parsons* for respondents. A local or a partial divided repute of marriage is of no avail. (*Clayton* v. *Wardell*, 4 Comst. 230; *Cunningham* v. *Cunningham*, 2 Dow. 482; *Brinkley* v. *Brinkley*, 50 N. Y. 198; *Dysart Peerage Case*, 6 Eng. Law Rep. [H. of L.] 514; *Stuart* v. *Robinson*, 13 Eng. Rep. 165; 1 Bish. on Marr. and Div., § 438. See 1 Greenl. Ev., § 107; *Dysart Peerage Case*, Eng. Law Rep., App. Cas. [H. of L.] 513; Abb. Trial Ev. 81, § 18; *Clayton* v. *Wardell*, 4 Comst. 236; *Brinkley* v. *Brinkley*, 50 N. Y. 198.) Cohabitation, and especially cohabitation without general repute, creates no presumption of marriage. (*Cunningham* v. *Cunningham*, 2 Dow. 482; *Clayton* v. *Wardell*, 4 Comst. 236; Abb. Trial Ev. 81; *Commonwealth* v. *Stump*, 53 Penn. St.

132, 135; *Hill* v. *Berger*, 3 Bradf. 448; Bish. on Marr. and Div., § 438; *Rose* v. *Clark*, 8 Paige, 581; *Hill* v. *Berger*, 3 Bradf. 448; *Ferrie* v. *Pub. Adm'rs*, 4 id. 87; *Fielder* v. *Fielder*, 2 Hagg. Ch. 195.) The illegitimacy of a child may be proved by probable evidence. (*Hill* v. *Berger*, 3 Bradf. 448; *Ferrie* v. *Pub. Adm'rs*, 4 id. 87; *Fielder* v. *Fielder*, 2 Hagg. Ch. 195.) The only possible presumption from the facts is, that the relations commenced in McDougal street between the parties were meretricious. (*Brinkley* v. *Brinkley*, 50 N. Y. 198; *Rose* v. *Clark*, 4 Comst. 423; *Cunningham* v. *Berdell*, 4 Bradf. 482.) The relations being meretricious in their origin, the presumption of the law is, that they continued to be so. (*Clayton* v. *Wardell*, 4 Comst. 230; *Cunningham* v. *Cunningham*, 2 Dow. 482; *Chamberlain* v. *Chamberlain*, 71 N. Y. 423; *Williams* v. *Williams*, 47 Wis. 464; *Stuart* v. *Robinson*, 13 Eng. Rep. 165.) The testimony did not change the illicit character of the relations between the parties into matrimony. (*Clayton* v. *Wardell*, 4 Comst. 230; 53 Penn. St. 136; *Brinkley* v. *Brinkley*, 50 N. Y. 198; *Cunningham* v. *Berdell*, 4 Bradf. 482.) The declarations, etc., and acts of Mr. Badger, put in evidence by plaintiff, are no ground for presuming a marriage with plaintiff. (*Davis* v. *Brown*, 1 Redf. 259; Dow. 482; 13 Eng. Rep. 165; *Chamberlain* v. *Chamberlain*, 71 N. Y. 426; *Stewart* v. *Robinson*, 13 Eng. Rep. 188, 191; *Stewart* v. *Robinson*, id. 205.) The facts and circumstances do not warrant the presumption of " a marriage contract *animo et facto*," between the plaintiff and Mr. Badger. (*Brinkley* v. *Brinkley*, 50 N. Y. 198; *Clayton* v. *Wardell*, 4 Comst. 233; *Hill* v. *Berger*, 460.)

FINCH, J. The plaintiff claims dower in the lands of Jacob Badger, deceased, whom she alleges to have been her husband. The defendants deny the marriage, and so raise an issue of fact which forms the vital point of the controversy. No formal or ceremonial marriage is proven, nor any express agreement between the parties constituting such relation. The proof offered is that of cohabitation continued for a long period of time,

and characterized by general repute, and by conduct and conversation indicating, as is claimed, an intercourse rather matrimonial than meretricious. It is not our duty to solve the problem raised by the evidence, but some general understanding of the facts is necessary to a proper appreciation of the questions of law which are submitted for decision.

The decedent appears to have lived two lives. They ran parallel with each other for more than a third of a century, and without approach or collision. In one locality, and among his own relatives and friends, he seemed to be a bachelor possessing considerable wealth; at the head of a respectable business; occupying rooms with his sister and with others during much of the period; and if not always at home, yet not so frequently absent as to arouse suspicion or remark. In another locality in the same city, but perhaps in an humbler neighborhood, he appears as John Baker; living with the plaintiff as his wife; introducing her as such; called uncle by her nephew, and deemed father by her daughter; paying her bills and expenses; furnishing her with the food and shelter which he shared; nursing her through severe and continued illness; seldom absent at night; attending her mother's funeral as one of the family of mourners; the intercourse creating no scandal, but reputed to be virtuous and respectable, and that of husband and wife.

It is over this cohabitation, and its true character and meaning that the controversy arises. So far as we know, the association began when the plaintiff was young; and the decedent in middle life, and continued until he fell dead, an old man of seventy-six. It lasted without break or interruption. It survived the loss of youth and its attractions; it ran on through sickness, paralysis, and some degree of mental weakness; it showed no trace of the satisfied passion that tires of its victim and abandons her for new temptation; it did not change when the girl had grown into the matron and become deaf and lame; it stayed with the tenacity of love and duty, remaining patient and faithful until the end. It is argued with great force, that if this relation was that only of lover and mistress, it approached strangely near to matrimonial truth and devotion, and gave to

unlawful lust an endurance and virtue not common or ex-
pected.

The reputation attending this cohabitation in the neighbor-
hood where it existed and was known among those brought into
its presence by relationship, business, or society, was that which
ordinarily attends the dwelling together of husband and wife.
It has been well described as the shadow cast by their daily
lives. (1 Bishop on Marriage and Divorce, § 438.) In the
general repute surrounding them, the slow growth of months
and years, the resultant picture of forgotten incidents, passing
events, habitual and daily conduct, presumably honest because
disinterested, and safer to be trusted because prone to suspect,
we are enabled to see the character of the cohabitation, and dis-
cern its distinctive features. It is for that reason that such
general repute is permitted to be proven. It sums up a
multitude of trivial details. It compacts into the brief phrase
of a verdict the teaching of many incidents and the conduct of
years. It is the average intelligence drawing its conclusion. It
would leave us without serious doubt of the true inference to
be adopted, but for the apparent concealment indicated by the
assumption of a false name, and the persistent silence of the
decedent among his own relatives. We have no certain ex-
planation of these facts. We cannot tell why they existed.
While not necessarily inconsistent with the fact of a marriage,
and perhaps possible of explanation, we cannot deny that they
belong more naturally to, and are more easily explained by an
illicit and clandestine intercourse, than one honest and open
and not needing disguise. They tended, therefore, to throw
some doubt upon the character of the cohabitation, and to
raise over it a question as to the legitimate inferences to be
drawn.

To another alleged fact, pressed upon us for the same pur-
pose by the defendants, we give little heed. It was said that
this cohabitation was illicit in its origin, and must be pre-
sumed to retain that character until proof is given of a change
in its object and purpose. To establish the fact, the appellants
go back to the girlhood of the plaintiff, and recall an event

which, they claim, reflects upon her purity. At the age of about seventeen she returns to her home with an infant of tender years. No husband comes with her or is known; there is no acknowledged father of the child; not a word of explanation seems to have been made; and we are asked, for this reason, to infer that an illicit connection had existed between the mother and some person unknown. When this child was two or three years old, the mother and Jacob Badger are found living together in McDougal street, keeping house to all appearances, as husband and wife, and their cohabitation assuming at once to all outward seeming, the characteristics which attended it to the end. Because of this alleged lapse of virtue on the part of the woman, it is argued that the cohabitation was illicit in its origin. The proof does not warrant such a conclusion. It shows no connection whatever between the parties prior to the commencement of their cohabitation in McDougal street. Back of that, it is sufficient to say, we have no information or evidence of any intercourse between them. We do not even know, except perhaps presumptively, that the child born before is the plaintiff's daughter. We certainly do not know who was its father, nor whether the offspring of an illicit intercourse or a matrimonial connection. At all events the testimony introduces Jacob Badger for the first time at the commencement of the cohabitation which is the subject of dispute. To say that it was illicit in its origin is to assume its meretricious character in the face of the evidence which tends to show it to have been matrimonial, and so beg the question, since the cohabitation at the beginning is not shown to be other or different from its continuous character to the end. Prior to this we are without information, and must not presume guilt where innocence is possible, and, least of all, indulge in a mere guess that Jacob Badger was a party to the wrong.

The rule that a connection, confessedly illicit in its origin, or shown to have been such, will be presumed to retain that character until some change is established, is both logical and

just. The force and effect of such a fact is always very great, and we are not disposed in the least degree to weaken or disregard it. (*Brinkley* v. *Brinkley*, 50 N. Y. 198.) Very often the changed character of the cohabitation is indicated by facts and circumstances which explain the cause and locate the period of the change, so that in spite of the illicit origin the subsequent intercourse is deemed matrimonial. (*Fenton* v. *Reed*, 4 Johns. 52; *Rose* v. *Clark*, 8 Paige, 574; *Starr* v. *Peck*, 1 Hill, 270; *Jackson* v. *Claw*, 18 Johns. 346.) But a change may occur, and be satisfactorily established, although the precise time or occasion cannot be clearly ascertained. If the facts show that there was or must have been a change, that the illicit beginning has become transformed into a cohabitation matrimonial in its character, it is not imperative that we should be able to say precisely when, or exactly why the change occurred. (*Caujolle* v. *Ferrié*, 23 N. Y. 90.) While we have no hesitation about the rule, and shall be prompt to apply it in a case which demands such application, we do not see that the facts before us require it, since they fail to establish an illicit origin of the cohabitation as a separate and independent fact. But the other facts remain, and are entitled to their due consideration. The disguise of a false name, known and assented to by both parties; the two lives so different and utterly unlike, running on at the same time and demanding adequate explanation, must be admitted to bear upon the character of the intercourse, and to have introduced into it possible elements of doubt.

We are thus enabled to see what the precise question of fact was. A continuous cohabitation for about thirty-five years between these parties was established. It was either meretricious or matrimonial, and all the evidence properly admissible and touching that inquiry, was such only as tended to solve the doubt.

The defendants were permitted to prove, under repeated objections and exceptions, that Jacob Badger was reputed to be a bachelor and unmarried. This proof was given by persons who were his friends and acquaintances, but who knew noth-

ing of the plaintiff, were unconscious of her existence, and in total ignorance of her cohabitation with the decedent.    The repute thus proven was not the product of the cohabitation, and did not tend to explain it, or solve its character.   It could not by possibility bear upon it.   It was not its shadow, for it cast none into the locality where these witnesses were.   It was the shadow of a different and distant fact which in itself was not ambiguous, and needed no explanation to relieve its character of doubt.    That the decedent lived a single life, without presence or appearance of wife or daughter at his rooms when boarding with his sister, was a fact properly proved and clearly admissible.    But that among those who thus saw him, and before whom nothing had occurred to raise the question, he was reputed to be unmarried was pure hearsay, explaining nothing since there was nothing to be explained.    The life of John Baker in McDougal street was ambiguous, in the sense that it might indicate an illicit intercourse or a matrimonial connection.    To ascertain which, the shadow it cast upon surrounding society could be examined and studied usefully for the solution of the doubt.    The life of Jacob Badger in Joralemon street was not ambiguous at all, and needed no help to solve its character.    It is, indeed, said that the purpose was to show a divided repute, and so contradict the reputation of marriage, which to be effective must be general.    But the general repute proved, and that required to be shown, does not and cannot go beyond the range of knowledge of the cohabitation. If within that range there is division as to the character of the fact, the divided repute merely continues the ambiguity and determines nothing.    In *Clayton* v. *Wardell* (4 N. Y. 230), the divided repute was of a marriage, among some friends, and a disreputable connection, among others ; thus negativing a general repute of connubial intercourse among those having knowledge of the cohabitation. In *Commonwealth* v. *Stump* (53 Penn. St. 135), the reputation shown related to the parties and their association, and was that they were not married. In *Vincent's Appeal* (60 Penn. St. 228), the husband lived two lives as here, and his repute as a bachelor among those who knew him by his

true name was proved; but no question was raised over it, and it was not allowed to prevail as against the general repute of marriage in the locality where both parties lived. It was treated as utterly ineffective to produce a divided reputation. In *Lyle* v. *Ellwood* (L. R., 19 Eq. Cas. 98), the repute was divided, and that of marriage allowed to prevail, but it was among those cognizant of the cohabitation and having reference to it as a fact to be explained. We have been able to find no case where such evidence as was here given, upon its admissibility being challenged by objection, has been held competent. The evidence of reputation, when admitted, is an exception to general rules. It should never be allowed to stray beyond some useful or necessary purpose. In its application to cases of pedigree it is justified by difficulties of proof, and confined generally to the family and relatives whose knowledge is assumed, and who have spoken before a controversy arisen. In its application to the fact of marriage it is more than mere hearsay. It involves and is made up of social conduct and recognition, giving character to an admitted and unconcealed cohabitation. But, in its application to a man living in appearance a single life, it adds nothing to that fact, it creates no further contradiction to an intercourse carried on elsewhere under the appearance of matrimony, and throws no additional light upon it. It amounts to bare hearsay, and the unsworn declarations of persons knowing nothing of the facts in controversy. In the present case twenty-three different witnesses were allowed to testify to the reputation of the decedent as a bachelor, not one of whom before his death had seen or heard of the plaintiff, or known of her connection with him. We do not think this evidence was admissible. Its very volume and frequency indicates the dangerous effect it may have produced upon the mind of the court, and we cannot disregard the error.

We think, also, that the letter offered in evidence, the body of which was in the handwriting of the decedent, and which was signed by the plaintiff as Mrs. Mary Baker and addressed to her nephew, was improperly excluded. That the decedent wrote the body of the letter and was at least assenting to its

transmission is not denied.  Although signed by her it was their joint act.  It congratulated the nephew upon his marriage ; it said " we wish you much joy ; " it added, " we expected a visit from you and your wife ; " it announced that a present was awaiting him and that his mother called on a previous day ; and its signature was a representation by the woman signing that she was a married woman passing by the name of Baker.  (*The Dysart Peerage Case*, L. R., 6 Appeal Cases, 512.)  The nephew swears that decedent afterward asked him if he received the letter, and that he called and obtained the promised present.  Here was an act which tended to characterize the existing relation and indicated in many ways its connubial character.  The use of the plural " we " without unnecessary explanation, and assuming that it would be perfectly understood, is one such fact.  If the connection was unhallowed and disgraceful, would the parties to it be likely to invite a newly married couple, beginning in their youth a life of virtue, to a scene of concubinage and lechery?  And if they were shameless enough for that, would they have called the person addressed nephew, and sent the letter with a distinct assertion of marriage in its signature ?  It seems to us, as we read it, to indicate a conscious innocence in the relation of the parties sending it, and an entire confidence that the nephew already so understood its character.  It was a joint act, occurring during the cohabitation, calculated to reflect light upon its character, and clearly admissible as part of the *res gestæ*.  We think it was error to exclude it.

A further question arose over the evidence of a witness sought to be contradicted.  One Whitbeck, called on behalf of the plaintiff, testified to a conversation with decedent when living in Bainbridge street, and when they were sitting on the front piazza, in which the latter said he was a married man once, when he was a young man.  The witness was cross-examined as to this conversation and then dismissed.  At a subsequent stage of the trial he was re-called by the plaintiff, and testified only to the date of his residence in Bainbridge street, to the fact that Almira Badger lived there as his tenant, and

that Jacob Badger did not reside there or stay there at night. On cross-examination he was asked by defendants' counsel whether, on an occasion when they were moving furniture, he did not ask decedent, in the presence of Almira, whether he was married, to which he replied, "no, sir; I am a bachelor." The witness denied any such conversation. Later in the trial Almira Badger was called to testify to this conversation. Objection was interposed on behalf of plaintiff. The court admitted the evidence "to contradict Whitbeck, and not as a declaration of deceased." The limitation of the court seems to concede that the declarations of decedent were incompetent as such in behalf of the defendants. While it is now claimed that they were admissible as part of the *res gestæ,* it is quite evident that the ruling at the trial went on a different ground. In *Van Tuyl* v. *Van Tuyl* (57 Barb. 241), it was held that the declarations of Taylor, made in promiscuous conversations, having no reference to Mrs. Taylor, that he was not a married man, were properly excluded; that they did not refer to her *status,* and constituted no part of the *res gestæ.* This is a somewhat narrower statement of the rule than that given by the *Chancellor* in the case of *Taylor* (9 Paige, 614). But the case here is different from both. It resembles the former in the peculiar fact of two lives running parallel with each other, and tending to contradictory inferences. Taylor seemed to be a married man at Harlem, where he dwelt with a woman whom he recognized as his wife, and appeared to be a bachelor at Rye where he lived with his own immediate relatives. His declarations at the latter place were excluded. Without determining the propriety of that ruling, there is in the present case an additional fact of very great importance in its bearing on the question of evidence. The plaintiff proved a long cohabitation, matrimonial and respectable in its character, and relied upon the inference of marriage to be drawn from it. To rebut that inference, and weaken its force, the defendants proved a parallel life wearing the appearance of celibacy. To modify that fact, and break its force as founding a counter inference, the plaintiff proved the declaration of decedent that he had

been a married man, but it wouldn't do to let "the women," — meaning the relatives with whom he was living, — know it. This statement tended to explain, consistently with an existing marriage, the silence of the decedent to his relatives, and to take away the natural inference to which his life as a single man led. And thus the meaning of that life was challenged. The defendants then sought to restore the inference by showing the declarations of decedent to the same witness that he was unmarried. No objection was made to the effort by the plaintiff, but it failed by reason of the denial of the witness. Then Almira Badger was called and the declaration of decedent to Whitbeck proved by her. At this point an objection was interposed, but general and assigning no specific ground. The declaration was certainly relevant and material. It tended to restore to the defendants the benefit of the inference to be derived from the decedent's bachelor life, as against the effect of the declarations proved by plaintiff. It bore, therefore, in the end upon the main issue, and cannot be treated as a collateral matter, and immaterial, so as to prevent contradiction, and make the answer conclusive. Being evidence, relevant and material, it was admissible unless some rule of law excluded it. (*Platner* v. *Platner* 78 N. Y. 90.) The objection taken at the trial pointed out none. On the argument here two only are stated. These are that defendants were bound by Whitbeck's answer, which would have been true if the subject of inquiry had been collateral, instead of bearing as we have seen upon the precise issue involved, and that Almira was an interested party and could not testify to a personal transaction between herself and deceased. It was not such. There was no transaction or conversation between her and decedent. She was merely a listener to one between him and the witness. (*Cary* v. *White*, 59 N. Y. 336; *Hildebrant* v. *Crawford*, 65 id. 107.) We cannot say, then, that error was committed in the reception of this evidence, in view of the course of the trial and the character of the objections taken. Underlying the whole subject are grave questions as to what, in a case like the present, constitutes the *res gestæ*, and the limitations which properly attach to dec-

larations offered on that ground, which we do not now undertake to determine since they were not sufficiently raised.

There must be a new trial, however, on account of the errors first considered. The case is important, and on a further hearing the facts may and should be more fully developed.

The judgment should be reversed, and new trial granted, costs to abide the event.

All concur.

ANDREWS, Ch. J., MILLER and TRACY, J. J., concurring in result.

Judgment reversed.