Daniels, J.
The intestate died at 510 East Thirteenth street, the place of her preceding residence, on the 28th of April, 1880, and letters of administration were issued upon her estate to James O’Reilly, as her husband. She left no children and her first cousins were her next of kin. They applied to the surrogate to vacate and set aside the letters of administration, upon the allegation that, the intestate *77 was not at any time the wife of O’Reilly. This was denied by him, he asserting that he was her husband at and before the time of her decease. It was thereupon referred by the surrogate to a referee to take the proof upon this controverted allegation, and to return it, with his opinion upon it. to the surrogate. The referee took a large amount of testimony and stated his opinion, or conclusion, to be that the intestate and administrator never sustained the relation of husband and wife to each other. It was conceded, in the course of the proceeding before him, that there was no ceremonial marriage between the parties, and whether they had been married in fact by their own-agreement and conduct was the controverted subject before the referee. The surrogate took a different view of the evidence from that which had impressed itself on the mind of the referee, and held that it did establish a marriage between these parties, and because of that fact the application to vacate or set aside the letters of administration was denied.
It was proved beyond controversy that the intestate and O’Reilly lived together for a considerable period of time before her own decease. And from that circumstance a presumption did arise that they sustained the relation of husband and wife to each other, without the formal solemnization of their marriage, as they very well might under the authorities in this state, considering and determining the effect of the conduct and declarations of such parties. Starr v. Peck (1 Hill, 270), where it was said in the course of the opinion of Cowen, J., that it is “the presumption that the parties would not indulge in a connection which was immoral, not to say criminal, especially when they might themselves alone have rendered it innocent by a marriage contract per verba de prcesenti, we are to presume against a notorious act of immoralty almost as strongly as we would against the commission of a legal crime.” Id., 272. And this seems to be conceded to be the law in Badger v. Badger (88 N. Y., 546). And it certainly was not doubted in Harbeck v. Harbeck (102 N. Y., 714; 2 N. Y. State Rep., 457) But after all it is at most only a presumption which must yield to other facts when they are proved by evidence in direct conflict with its existence. And it was to make such proof that the witnesses on behalf of the petitioners were examined before, the referee.
Their testimony consisted, so far as it was material, of statements made both by the intestate and O’Reilly to the effect that they were not married, and of the fact that before her burial her name of Hanley was placed upon her coffin, and that in the certificate made by the physician her name was given as Mary Ann Hanley, and she was described as being a fvidow. This certificate was made on information *78 obtained by the physician from O’Reilly himself. And it was further stated by some of the witnesses examined on. behalf of the petitioners that she had been known only by the name of Hanley down to the time of her decease, it was added by one of the witnesses that O’Reilly stated to-him that he was a boarder there and paid his board regularly to Mrs. Hanley. And after her decease it is stated by the witness Mary Devin that she asked O’Reilly if he was married to Mrs. Hanley, and he said that he was not. And the witness James Toole testified that in a conversation taking place three or four days aftr Mrs. Hanley’s death he asked O’Reilly for the keys of the room, when the latter replied that he would give them up the next day, when he would get an expressman to move an old trunk and a valise, and an old blanket he had when he was on board a ship, which was the extent of the claim made by him.
This evidence was met by denials ón the part of O’Reilly himself and by testimony obtained from a still larger number of witnesses, that O’Reilly and the intestate were in the habit óf addressing each other as husband and wife; that she spoke of him on a number of different occasions as her husband, and at one time stated that she had been married to him for a period of over four years, and that she did not desire to divulge the fact until after her father should be dead a year, and for that reason she went by the name of Mrs. Hanley. And her father had not been dead for the period of a year at the time of her own decease. It was also stated by one of his witnesses that O’Reilly and the intestate attended her father’s funeral together; that they sat together in the church, and went to and from the burial in the same manner. It was also added by one of his witnesses that she was intoxicated at the time referred to by him when she stated that she was married to O’Reilly and that after she became sober she denied that fact. Near the time of her last illness her attendant physician testified that he was requested to attend her by O’Reilly who asked him to go and see his wife. He accordingly went to her residence but found no Mrs. O’Reilly there, and finally she opened the door and stated that she was the person for whom he was in search. After her decease he obtained the information for making his certificate from O’Reilly, who directed him to insert the name of the intestate as Mary Ann Hanley. The witness then observed that it was a very extraordinary thing that he should be treating a lady called Mrs. O’Reilly and that her name should then be given to him as Mary Ann Hanley, but that no reply was made to this remark. This is the general character of the evidence taken before the referee, with further testimony in behalf of O’Reilly that they were reputed to be husband and wife *79 by the witnesses who were interrogated upon that subject, and who were acquainted with these persons. But in answer to this testimony other evidence was produced on behalf of the petitioners stating the repute to be the other way, that they were not husband and wife.
The preponderence of evidence seems to have been, slightly to say the least, in favor of O’Reilly. And as the testimony was taken subject to the decision and disposition of the surrogate, he was empowered under this view of it to adopt the conclusion that O’Reilly was the husband of the intestate.
But while that decision may have had the support of the evidence it did not justify a denial of the application, for exceptions have been taken on the hearing to the exclusion of evidence by the referee, which should have been received by him. And until that evidence is in the case, and the ruling corrected in this manner, it will not be in a. condition for final decision.
It was proposed to be shown by Mary Devin, who was a second cousin of the intestate, that she had a conversation with her during her last illness regarding her relations with O’Reilly. This was objected to on the ground that the witness was incompetent to relate the conversation under section 829 of the Code of Civil Procedure, and her evidence was excluded under the construction that she was interested in its result. But she had no other interest than that of being entitled to participate in the estate as one of the next of kin of the intestate after the decease of all the first cousins of the latter, and that, on account of their number, was so remote as scarcely to arise to the dignity of a possibility. What this section of the Code has done in the way of directing the exclusion of witnesses is restricted to those who are interested in the action or proceeding. That exclusion depends upon a present fixed interest, not one remote and contingent, as was the mere possible interest of this witness. That was also the rule under the preceding system of practice excluding interested witnesses as incompetent. It never was applied to the exclusion of the testimony of a witness having but a bare possibility of becoming interested at some future period of time. And the referee therefore erred in the ruling excluding the testimony proposed to be given by this witness. And as it related to a conversation with the intestate during her last illness, it may have been entirely controlling over this controversy. A like ruling was made excluding a conversation with the same witness proposed to be shown to have taken place on the 7th of April, 1880. The referee also struck out as incompetent an answer given by the witness Mary Ann Fagan, testifying that she did not believe the intestate was *80 married, although she had previously received information that the fact was otherwise from the intestate. But this ruling was corrected by an answer afterwards received and retained to the same effect. A very large number of other exceptions were taken in the progress of the hearing before the referee, but these seem to be the only ones deserving of any special attention. The evidence proposed to be taken from the witness Mary Devin should have been received, and the order denying "the application to vacate or set aside the letters testamentary should be reversed, and an order made sending the case back to the referee, with directions to receive this testimony, and any other additional evidence bearing upon this controverted marriage which may be offered by either party, and the costs of the appeal should abide the final result of the proceeding.
I concur in the result, without expressing any opinion as to whether or not the proof was sufficient to justify a finding that at any time a contract of marriage had been entered into.
Van Brunt, Oh. J., concurs; Brajdy, J., concurs in the result