(91 Misc. Rep. 185)

### In re FARLEY'S ESTATE.

(Surrogate's Court, Clinton County.　March, 1915.)

1. MARRIAGE ☞40—PRESUMPTIONS.

Persons holding themselves out as husband and wife are presumed to be married.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–69, 79; Dec. Dig. ☞40.]

2. MARRIAGE ☞50—SOLEMNIZING OF MARRIAGE—SUFFICIENCY OF EVIDENCE.

Evidence introduced on the trial of an assignee's claim against an estate for the assignor's distributive share as widow of the deceased *held* insufficient to show that the alleged union had its inception in a ceremonial marriage, as required by Rev. Laws Mass. 1902, c. 151, § 30.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 79–89; Dec. Dig. ☞50.]

3. MARRIAGE ☞40—COMMON-LAW MARRIAGE—SUFFICIENCY OF EVIDENCE.

Evidence *held* not to create the presumption that the relations admittedly illicit at their inception, shown to have existed between the alleged widow and deceased during a two weeks' stay in Pennsylvania, or protracted stays in New York, amounted to or culminated in a common-law marriage.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–69, 79; Dec. Dig. ☞40.]

4. MARRIAGE ☞40—PRESUMPTION—REMARRIAGE DURING LIFE OF FORMER HUSBAND.

On trial of the issue of the existence of a marriage between deceased and a woman who survived him, it was shown that their only child died before they separated, that after separation and before the death of deceased the woman, without obtaining any divorce, married another man, by whom she had two children, who were still living. *Held,* that the presumptions in favor of legitimacy of birth and cohabitation required a presumption that there was no marriage to decedent.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–69, 79; Dec. Dig. ☞40.]

5. MARRIAGE ☞40—VALIDITY—PRESUMPTION.

It will be presumed that a woman has contracted a legitimate marriage, rather than that she has committed bigamy.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 58–69, 79; Dec. Dig. ☞40.]

6. EVIDENCE ☞121, 285—HEARSAY—DECLARATION OF PERSON SINCE DECEASED—RES GESTÆ—PEDIGREE.

Where, in the trial of an assignee's claim against an estate for the distributive share of decedent's widow, the marriage of decedent and the assignor was in issue, the testimony of decedent's mother, reciting an alleged declaration by him while he lived with the assignor to the effect

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes .

that he was not married to her, was admissible, not only as part of the res gestæ, but as involving a matter of pedigree.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 303, 307–338, 1117, 1119; Dec. Dig. ☞121, 285.]

7. WITNESSES ☞180—COMPETENCY—OBJECTIONS—SUFFICIENCY.

An objection that such testimony was incompetent and immaterial was insufficient to present the question of the competency of the witness; a general objection to evidence not being an objection that a witness is incompetent, under Code Civ. Proc. § 829, relating to testimony regarding transactions with deceased persons.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 726–730; Dec. Dig. ☞180.]

8. COURTS ☞200½—JURISDICTION—SURROGATE'S COURT—VALIDITY OF MARRIAGE.

The Surrogate's Court had power, even prior to the enactment of Code Civ. Proc. § 2510, amending the law relative to the power of the surrogate and enlarging the scope of the surrogate's jurisdiction, to decide the validity of marriages, as well as the validity of assignments of legacies or of distributive shares.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 479; Dec. Dig. ☞200½.]

9. COURTS ☞200½—VALIDITY—JURISDICTION—PARTIES.

Such power is exercised by the surrogate, however, only when the question is raised by the party concerned.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 479; Dec. Dig. ☞200½.]

10. EXECUTORS AND ADMINISTRATORS ☞314—DISTRIBUTIVE SHARE—ASSIGNMENT—VALIDITY—RIGHT TO QUESTION.

On a trial in the Surrogate's Court of an assignee's claim against an estate for the distributive share of decedent's alleged widow, the administrator of the estate cannot question the adequacy of the consideration of the assignment.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 1274–1297; Dec. Dig. ☞314.]

11. EQUITY ☞1—JURISDICTION—LIMITATIONS.

When a court is awarded general equity jurisdiction, it takes its authority subject to the limitations and precedents that accompany the same power in other courts exercising the same.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 1, 3, 6; Dec. Dig. ☞1.]

In the matter of the judicial settlement of the accounts of the administrators of James Farley, deceased. On determination of the claim of Henry C. Ricketson, assignee of Catherine Farley. Claim disallowed.

A. S. Hogue, of Plattsburg, for administrators.

C. H. Signor, of Plattsburg (P. J. Tierney, of Plattsburg, of counsel), for claimant.

M. William Bray, of Utica, for next of kin.

W. L. Pattison, for contingent claimants asking for intervention.

BOIRE, S. This trial is the result of a claim against the estate for the distributive share of the alleged widow of the deceased, and takes the form of an objection to the account, wherein it provides for the distribution of the entire personal property to the mother and sisters

of the deceased. The claimant is the assignee of the alleged widow, and claims under a written assignment purporting to assign and release to him "all the right, title, and interest in the estate, both real and personal," of the deceased, etc., by reason of having formerly been his wife.

The administrators denied the marriage of the deceased with claimant's assignor, and also sought to interpose the further objection to the claim that the assignment was procured by fraud and for an inadequate consideration. The second objection to the claim the administrators were not permitted to interpose for reasons that will appear hereafter. The contest consequently resolved itself into a question of a marriage or nonmarriage of the deceased with claimant's assignor. The main facts proven may be summarized as follows:

The claimant proved that the deceased, a wealthy man, who followed the unusual occupation of strike breaker, returned to Plattsburg, his former home—and from which he had been absent for several years—about August, 1903; that he purchased a home, moved his mother and sisters there, and also established in the household the claimant's assignor, whom he introduced as his wife; that part of his household also consisted of a child of tender age, who was known as his child and bore the name of Catherine Farley; that the said child died in 1904 and was buried in the family plot in the cemetery; that the alleged wife was also called upon to sign a deed with the deceased, and did so sign under circumstances indicating that the deceased held her out as his wife. There was further evidence offered of some traveling and visiting among relatives, wherein the deceased held out the woman as his wife. The woman, however, left the deceased soon after the death of the baby, and never returned to live with him permanently, although she occasionally visited him for several years thereafter, but never at his home. The woman in question married a stranger to these proceedings in 1909, apparently without ever having procured a divorce from the deceased, and is now the mother of two children from this union.

She herself was sworn by the administrators, and in her evidence recites what in substance she claims to be the truth of her relations with the deceased. In 1900, while living in Boston, Mass., she, being 20 years of age, became engaged to marry the deceased, who at that time was thought by her to be a motorman on the street cars, but was in reality a detective. In September of that year they appeared before the registrar of Boston, and filed a notice of intent to marry, and received a certificate or license to marry. On the way from the registrar's office the deceased proposed to her that she announce to her parents that they were married and that they live as man and wife. He thereupon went into a jewelry store and bought a wedding ring, came out on the street where she was standing, and gave it to her without any words. She acceded to his proposal, thinking, as she said, that the marriage would soon occur. They lived together at her father's home in Boston for a couple of months, then his duties for the next two years took him to Brooklyn, Pennsylvania, Buffalo, and New York City, at all of which places she lived with him as his wife for several weeks at a time, spending the greater part of the time, however, at

their home in Boston. In August, 1903, she moved with him to Plattsburg. She bore him a child, which was baptized as their legitimate child, Catherine Farley, who died in 1904.

In the meantime the increased prosperity of the deceased was accompanied by his increased indifference and cruelty towards her, and soon after the death of their child in 1904 she left him. She asserts that there never was any ceremony, contract, or understanding between them whereby they took each other in marriage. She asserts that she never considered herself his wife, although she hoped that he would make her his wife, and that she repeatedly requested him to do so, a request he always replied to by deferring the matter, or offering to have the ceremony performed in some place where they were well known, which latter offer was refused by her as certain to reveal to the public the illicit nature of their former cohabitation. She further asserts that she never got any divorce from him, and married in 1909 on the assumption that she was single, but publicly declaring that she was divorced in order to preserve her reputation. The deceased did not maintain her from 1904 until his death and made no settlement with her.

The assignment which brought on the contest grew out of the purchase by Henry C. Ricketson of a piece of real estate that had been recently owned by the deceased and deeded by the latter without the signature of the alleged wife. Ricketson, desiring a quitclaim of the premises from the woman, found her and for a nominal sum obtained, not only a quitclaim of the property purchased by him, but an assignment of any rights that would flow to her by reason of having been the wife of the deceased. This interest, if established, would be worth $17,000. In this transaction she asserted to Ricketson that she had married Farley and was divorced. Her version of this transaction is that she supposed she was merely clearing up the title to the property by quitclaim, etc., and did not believe that she was laying claim to anything against the estate, and that her allegations of marriage and divorce were made, not with a view of claiming any part of the estate of the decedent, or enabling any one else to do so, but solely for the purpose of protecting her name. She knew that the deceased was, or had been, a wealthy man, and consented to sign the assignment for nothing. Claimant alleges that he paid $2 for it, and she admits $2 were left with her. She was cited, but made no claim.

[1] From these facts we are called upon to decide whether or not there ever was a marriage between the parties. In so doing we are hedged about by various presumptions that arise either from public policy or amount in effect to inferences resulting from proven facts. A well-known presumption, requiring no quotation of authority, is that people who hold themselves out as husband and wife are presumed to be married, and were the proofs in this case confined to cohabitations and declarations of the parties up to the time of their separation their marriage could be legally accepted as a fact; but a brief survey of the evidence dealing with the inception of the relations precludes us from extending the presumption of legitimacy to these relations.

[2] No formal marriage was proven, and from the circumstances surrounding the case, and the testimony introduced, I am satisfied

that no ceremony was ever performed, and the testimony of the alleged wife denying a ceremony of marriage is very strongly supported by such circumstances and the evidence produced, as well as the evidence that is lacking.

This union had its inception in Massachusetts. The laws of Massachusetts for over 200 years have required the "solemnizing" of marriage, which event requires the intervention of a functionary or witnesses acting in a ceremonial capacity, and all of them required by law to make a return for the purpose of recording the marriage. The canon law, which is incorporated in the English common law, has never been accepted in the commonwealth of Massachusetts, so that, although we might be willing to disbelieve the testimony of the woman, the laws of Massachusetts prohibit our clothing the initial period of this union with the mantle of legal charity that the common law usually provides for events of this character, and leads inevitably to the conclusion that James Farley, in September, 1900, after filing a notice of intention to marry, took his sweetheart, not as a wife, but as a mistress. Massachusetts Public Statutes of 1882, c. 145, § 22; Massachusetts Public Statutes of 1902, c. 151, § 30; Commonwealth v. Munson, 127 Mass. 459, 34 Am. Rep. 411; Norcross v. Norcross, 155 Mass. 425, 29 N. E. 506; Peck v. Peck, 155 Mass. 479, 30 N. E. 74.

All of these cases interpret the statutes of Massachusetts and are authority for the conclusion above stated as to the law of Massachusetts on the subject of private marriages, or so-called common-law marriages, being in effect a simple contract, made privately between the parties. The first case cited traces the law back to early colonial times and so states the policy of the commonwealth. The second case cited is very similar to the present one, in that the parties had lived for short periods of time outside the state of Massachusetts and in states recognizing so-called common-law marriages, yet the court refused to uphold the alleged private marriage on any construction of events and refused to presume a marriage in the common-law states. In the last-named case the Massachusetts courts refused to uphold an agreement of marriage made in a common-law state, although the agreement was specially proven, because there was a reservation in the marriage agreement that it should last only during the continuance of mutual affection; the reservation being the result of religious convictions of the contracting parties.

[3] We are then called upon to presume a common-law marriage between the parties during a two weeks' stay in Pennsylvania, or protracted stays in New York state prior to 1902, the year in which common-law marriages came under the ban of the New York statutes, and we are cited Gall v. Gall, 114 N. Y. 109, 21 N. E. 106, and various cases of the same tenor, all of them being authorities for the legal proposition that a meretricious relation between parties may be assumed to have become legal from circumstances following the termination of the obstacle to a previous marriage or from other circumstances denoting such a change.

All of the cases cited, however, in support of this phase of the case, from Caujolle v. Ferrie, 23 N. Y. 90, to Matter of Matthews, 153 N. Y. 443, 47 N. E. 901, are cases where facts by way of the

conduct of the parties or change of circumstances warrant a conclusion that a relationship once illicit has changed in its character, either because of the removal of some legal impediment to marriage or the purifying of the bond of affection between the parties. Thus we read that "decent conduct, long continued, orderly, and apparently matrimonial in its character," etc., may overcome the presumption arising from the illegal origin of the union, and it might be noted here that, while I accept the authority of these cases, both because of the soundness of the decisions and their exalted legal source, yet one must bear in mind that many of these cases involved the upholding of a decision or a verdict on an issue of fact in a lower court, and for that reason some of these cases lose something of their force when cited on an original trial for the determination of a question of fact.

In my opinion the comparative brevity of the relation between Farley and the woman in question should go a long way to convince me that the outer demonstrations of their union should not be construed as matrimonial, and this, together with the fact that the continuance of the relations between the parties, far from affording grounds for believing the relationship matrimonial, would naturally lead us to the other conclusion, since time only produced more discord and dissension between them, which finally culminated in its termination in 1904, less than four years from its inception. Their relationship thereafter consisted of occasional meetings away from their home; and these could scarcely be called matrimonial in character, and even these semi-clandestine meetings terminated in 1907 without death or divorce intervening to sever them.

There is no proof of support by the alleged husband from 1904 on or of any legal proceeding by way of divorce or nonsupport on the part of the estranged woman, although it is fairly certain that she consulted an attorney on the general subject of her relationship with the deceased. She knew he was a wealthy man, and it would seem as though something of the above nature would have developed from these considerations had the parties been man and wife. Such action, had it taken place, could scarcely have avoided the evident scrutiny of the aggressive claimant in this case and that of his adroit attorneys, who, from the record, appear to have been on the ground investigating and testing the consistency of the woman's testimony, of the nature of which they were apprised in advance of the trial.

The undisputed evidence, therefore, would seem not to require that we indulge a presumption that the illicit relations were transformed by marriage, but rather would sanction the presumption that a relation illicit in its origin continued such until its termination in discord and separation while the woman was still young and in possession of all her beauty, and while the man was about to achieve the pinnacle of his financial success. The coincidence is significant and proves that a relationship inspired by folly and inexperience broke down for lack of the support that could be afforded only by the bulwarks that form a part of the matrimonial relation.

[4] There is also another feature of this case that should not escape attention. That feature of the case is this: Law favors both

legitimacy of birth and of cohabitation, and all of the cases cited in support of a construction of the facts of this case as matrimonial in character are cases that involved either legitimacy of children or were invoked by the spouse in support of honor and property rights. These cases are therefore clearly distinguishable from the present one on both of these grounds. Moreover, the reasons underlying the presumption invoked by the claimant in this case are the very ones public policy indicates should sustain a presumption against the claimant. Legitimacy is not so much for individual advantage as for the public good. In the case under consideration there is no surviving issue, one party is dead, the other is remarried without divorce, and is the mother of two children. Public policy, which controls the presumption in doubtful cases, would seem to lend its sanction to the support of the present marriage, as the law is forward looking and progressive rather than reminiscently sentimental.

I have reviewed the law applicable to this case on the assumption that the evidence was evenly balanced, but as a matter of fact there was a heavy preponderance of evidence against the claimant and only a portion of the administrators' proofs is set forth in the foregoing.

[5] The claimant has shown much ingenuity in marshaling the evidence of the case in his brief, and we are asked to entirely disbelieve the claimant's assignor, the original source of this claim, and to conclude that she was an experienced woman, well versed in the law, for the purpose of making her assignment to claimant, but to presume that she was ignorant of the law on the question of the legal requirements of a marriage and the necessity of a divorce for a remarriage, and that she is likewise ignorant of the criminal responsibility for bigamy or the legal status of her offspring. I think that, if any presumption can be indulged on the question of her marriage in 1909, both the facts in the case and the general presumption of law favored a presumption that the woman contracted a legitimate marriage rather than the presumption that she committed a crime, to wit, bigamy. Matter of Matthews, supra.

Claimant also advances the argument that claimant's assignor dare not testify that she was married to the deceased because she would thereby make herself out a bigamist and would have to face that awkward situation in her domestic affairs, and this same reason is ascribed to her willingness to part with for nothing property rights worth several thousand dollars. This argument could be answered by a reiteration of the above, and the further argument that in order to accept this hypothesis we have to presume the existence of the disputed marriage; hence this argument is of no value, once we have decided that there was no marriage, or rather that the claimant has not shown a marriage.

[6] In his brief the claimant expresses the opinion previously expressed by him in summing up that the testimony of the decedent's mother reciting an alleged declaration by the decedent during the time he lived with the woman in question and in which the witness testified that the deceased told the witness, his mother, that he was not married to this woman, is incompetent and should not have been

admitted. The testimony is clearly competent and highly important, both as a part of the res gestæ, and secondly because it involves a matter of pedigree. Badger v. Badger, 88 N. Y. 546, 42 Am. Rep. 263; Eisenlord v. Clum, 126 N. Y. 552, 27 N. E. 1024, 12 L. R. A. 836; People v. Miller, 30 Misc. Rep. 355, 63 N. Y. Supp. 949. ·

[7] Claimant intimates that it is forbidden by section 829 of the Code of Civil Procedure relating to testimony regarding transactions with deceased persons. To this objection the answer is that the objection made to the testimony was that "it is incompetent and immaterial." The objection was insufficient to raise the question of the competency of the witness, being as it was addressed to the competency of the testimony. A general objection to evidence is not an objection to a witness, and an objection under the section quoted must be directed against the witness and state the particular grounds. Hickok v. Bunting, 67 App. Div. 560, 73 N. Y. Supp. 967; Russell v. Hitchcock, 105 App. Div. 315, 93 N. Y. Supp. 950; Morgan v. Foran, 120 App. Div. 185, 104 N. Y. Supp. 1084.

Having arrived at the conclusion that there was no marriage between the deceased and the claimant's assignor, the decision makes it unnecessary to decide the question of the validity or invalidity of that assignment, since the assignment carried nothing with it of concern to the administrators, but in view of the novelty of the question, arising as it does soon after an amendment to the law relative to the powers of the surrogate, whereby surrogates are given a broadened jurisdiction under section 2510 of the Code of Civil Procedure, and in view further of the fact that the issue was raised by an administrator whose duties partake of the nature of a trust, it may not be barren speculation to dwell on the question of the authority of the administrators to interpose to the claim the defense that this assignment to the claimant was illegal because of fraud and inadequacy of consideration. The administrators were not permitted to interpose this defense, but in their brief they ask its consideration, inasmuch as by mutual consent and by the necessary examination of the assignor on her motives and credibility practically the complete transaction relative to the assignment has found its way into the record.

[8] There is little doubt that, even previous to the recent amendment enlarging the scope of the surrogates' jurisdiction, this court had the power to decide the validity of marriage as well as the validity of assignments of legacy or of distributive share. Matter of Thornburgh, 72 Misc. Rep. 619, 132 N. Y. Supp. 268; Matter of Dollard, 74 Misc. Rep. 312, 133 N. Y. Supp. 1107.

Matter of Grant, 37 Misc. Rep. 151, 74 N. Y. Supp. 958, cited by claimant, is obsolete, as it was decided before the amendment of 1910, known as section 2472a of the Code of Civil Procedure, and likewise previous to the amendment of 1914, further enlarging the surrogates' powers by section 2510.

[9-11] This power of the surrogate is exercised only when the question is raised by the party concerned, and while surrogates are given a wide range of power to decide "questions legal or equitable arising between any or all parties to any proceeding," etc., there is nothing in the section to indicate so wide a departure from the ordi-

nary principles of jurisprudence as to read into that section the authority of the surrogate to decide and the right of an administrator to raise questions that have never otherwise arisen and that concern neither the court nor the administrators, since one is not in privity with the person whose rights have been invaded, and the other has no prerogative authorizing the determination of a purely personal right, when that right is not asserted by the only person concerned. It is a well-settled rule of law that when a court is awarded general equitable jurisdiction it takes its authority subject to the limitations and precedents that accompany the same power in other courts exercising the same. Therefore the authorities of the Supreme Court are binding on this phase of the case. These authorities satisfy me that the administrators could not interpose the objection of fraud and inadequacy of consideration, and consequently that the surrogate could not determine that issue.

It is well settled that an obligor's duty is to pay the one who holds the legal title to the obligation. He has no business to inquire into the adequacy of the consideration of an assignment; he has no duty to inquire into the good faith of the assignment; he only can insist that the holder of the obligation has the legal title, and, except in cases of equitable assignment, he is protected, and can only insist that he will be protected in making the payment. Matter of Pruyn, 141 N. Y. 544, 36 N. E. 595; Matter of Wagner, 119 N. Y. 28, 23 N. E. 200.

While the administrator's office has the characteristics of trust, once he has collected the assets, paid the debts, and is ready to account, he has no greater duty to the next of kin than a debtor owes to the owner of a debt, to wit, to pay. The office of an administrator is not paternal to the extent of taking up cudgels for beneficiaries who make no claim or contest, and who by their silence ratify the assignment of their interest. The administrators cited claimant's assignor. She made no contest, and specifically stated that she wanted nothing out of the estate. The administrators' duties were complete when they brought her in, and as between paying her or her assignee they can only be guided by the ordinary principles applying to debtors and trustees alike.

It is argued that the administrators represented the next of kin, which may be true; but it is equally true that they do not represent the next of kin in the private affairs of the latter, such as sale of their interests in property of any kind. Only the assignor or persons claiming under her could attack the assignment for fraud or inadequacy of consideration. The assignment was valid on its face, the assignor did not appear or attempt to appear in accordance with the ordinary rules for doing so, and the administrators are mere volunteers when they attempt to attack the assignment. Sheridan v. Mayor, 68 N. Y. 30; Allen v. Brown, 44 N. Y. 228; Graser v. Stellwagen, 25 N. Y. 315; Guy v. Craighead, 6 App. Div. 463, 39 N. Y. Supp. 688.

The administrators have sought to raise these identical issues by saying that the assignee was not a party to the proceedings. That is only another way to attack the assignment, and is met by the same argu-

ments that answer the direct attack on the assignment. Any person is properly a party who holds an assignment valid on its face, sufficient as the ordinary assignment, both under the common law and all statutes bearing on the subject, and properly authenticated and recorded. Under those circumstances, no assignment could be void, so as to preclude the appearance of the party claiming under it.

Decreed accordingly.