In the Matter of the Estate of ELLA V. VON E. WENDEL, Deceased.

Surrogate's Court, New York County, January 4, 1933.

*George Flint Warren, Jr.* [*John M. Harlan, Emory R. Buckner, Henry J. Friendly* and *John Edmond Hewitt* of counsel], for the proponent.

*Raymond L. Wise* and *Joseph P. Martin,* for claimant Thomas Patrick Morris.

*George L. Shearer,* for certain residuary legatees.

*Arthur Garfield Hays, Will Maslow* and *John Shulman,* for Rosa Dew Stansbury and others.

*Herbert Barry* and *John Crawley,* for American Society for the Prevention of Cruelty to Animals.

*Dorman & Dana* [*Thomas J. Mooney* of counsel], for New York Homeopathic Medical College and Flower Hospital.

*Rosenbloom & Sommer* [*David L. Podell, Bertram Sommer* and *Jacob J. Podell* of counsel], for Samuel K. Johnson.

*Benjamin A. Matthews,* for the Board of Foreign Missions.

*Griggs, Baldwin & Baldwin* [*Edwin N. Moore* of counsel], for Drew University.

*Otheman & Swain* [*Edward R. Otheman* of counsel], for St. Christopher's School.

FOLEY, S. This is a proceeding for the probate of the will of Ella V. von E. Wendel. Various phases of the litigation, which have arisen in the estate, have been treated by me in prior decisions. In *Matter of Wendel* (143 Misc. 480) the plan and procedure were outlined for the trial of the status of the relationship to the decedent of numerous claimants. There was a total of two thousand three hundred and three in this group. After the various hearings only nine claimants remain and they have established their relationship to the decedent as of the fifth and nearest degree of kindred. Within a period of eight months the other two thousand two hundred and ninety-four claimants have been eliminated and their appearances have been stricken from the proceeding. In *Matter of Wendel* (144 Misc. 467) I determined that this court had jurisdiction of the proceeding for the probate of the will because of the fact that the decedent was a resident of New York county. Of the various issues there remains for disposition only the trial of the validity of the

will upon the objections to probate filed by the nine established next of kin.

The immediate question here is the determination of the status of Thomas Patrick Morris. He claimed to be a son of John G. Wendel, a brother of the decedent, and that by reason of such relationship he was the decedent's nephew and her sole next of kin. The issue was tried by the surrogate without a jury. Voluminous testimony was taken and a very large number of exhibits received in evidence. At the close of the trial the claim was dismissed upon the merits. I held that the claimant was in no way related to the decedent and struck out his appearance in the proceeding. The importance of the case, the size of the estate, which has been estimated to be forty millions of dollars, and the extraordinary circumstances which developed during the trial justify, perhaps, in permanent form, the reasons for the determination of the surrogate and the conclusions reached by me upon the evidence .

The principal witness in support of his contentions was the claimant himself. He was born in Dundee, Scotland, on January 3, 1880. He claims to have been reared by his foster father and mother, Peter Morris and Margaret Morris. He believed them to be his parents. According to his story, in his early childhood, when he was about five years of age, there came to the Morris home, in Scotland, his alleged father, John G. Wendel. The latter's visits were repeated at intervals between about 1885 to the year 1902, when the last visit occurred. These visits usually occurred in the early summer. At almost the first of these meetings he was told by the gentleman to call him " Papa Wendel." After the various visits the family presented signs of prosperity. At such times the foster father was described as " flush " with money. Until the year 1902, aside from the use of the words " Papa Wendel," there was no definite statement by Wendel that he was the father of the claimant. In June of that year the alleged Wendel again visited the home, presented the claimant with a book entitled " The Blockade of Phalsburg " and told Morris that he was his son. The book was published by Scribner's in 1900. It contained, upon the inside of the front cover and on the fly-leaf, a letter dated March 1, 1901, addressed to " My dear son " and purporting to be signed by " Your loving father, John G. Wendel." It stated that he, Wendel, and Mary Ellen Devine of Edinburgh, Scotland, were married at Castle Garden on June 11, 1876; that subsequently a difference arose because of the religion of the parties and that in May, 1879, the claimant's mother and Wendel quarreled; that the mother left Wendel and went to live with a Mr. and Mrs. Morris at Dundee, Scotland. The date of the claimant's birth is given. It is stated

that a few weeks after the birth of the child the mother disappeared. The child is stated to have been registered as Thomas Patrick Morris.

Upon the last blank page of the book and upon the inside of the back cover is written the alleged will, dated March 1, 1901, in which the " testator " describes himself as of the county of Kings, New York city and State. The real John G. Wendel, so far as the record discloses, resided in New York and Westchester counties, and never during his lifetime resided in Kings county. The writer declares that owing to the objection of his sisters, especially " Mary and Ella " (the decedent) and their refusal to recognize his son by a secret marriage, he desired to make a disposition of his property. In it he gives everything to his son " Thomas Patrick Morris Wendel." He appoints him executor and requests his attorney, Charles G. Koss, to act as his son's adviser. Mr. Koss was actually the attorney for the Wendel family. The " will " purports to be signed by John G. Wendel and is attested by three witnesses. Morris, in continuance of his story, testified that the details contained in the foregoing letter and will were the subject of a conversation at the time of the presentation of the book by " Wendel " to the claimant in 1902. The claimant further told that between 1902 and 1907 he did not see his alleged father. He became a seaman and later a house painter. In his early manhood, about the years 1897 and 1899, he enlisted in a reserve company of the Black Watch Regiment for militia service in Scotland. In 1907 he came to New York as a member of the crew of the steamship *Caledonia*. He brought the book, " The Blockade of Phalsburg," with him. He deserted the ship. On the first day he was in New York city he accidentally, and by a strange coincidence, met Mr. Wendel in City Hall Park. He saw him on certain occasions thereafter and visited him at the Wendel home at No. 442 Fifth avenue. In early March of 1908, while there, he met his " aunt " Ella Wendel, the decedent here. A quarrel over the son took place between his alleged father and her, which resulted in Ella's parting sally to her brother to leave the home and take his " brat " with him. Shortly afterwards, Morris testified, he left New York city and went to Clifton, Ariz., where he was employed for several years by the Arizona Copper Company. About the year 1909 " Wendel " visited the plant where the claimant was employed at Clifton, with a group of directors or officers of the company. He had a conversation with the claimant at the time which involved a renewal of the acknowledgment that Morris was his son. About the year 1912 Morris returned to New York city and resided in the borough of Brooklyn almost continually since that year. John G. Wendel died

November 30, 1914. Morris never attempted to communicate with him between the time of his return to New York and the death of his alleged father, although Wendel's residence appeared both in the letter and the " will " and Morris himself, according to his testimony, knew from his visit where the Wendel home was located. Nor did Morris in any way communicate with any of the sisters of John G. Wendel or make any claim to the relationship, until the death of the last survivor of the family, the decedent here. There was considerable publicity between 1914 and 1930 in the New York city newspapers on the occasion of the death of John G. Wendel and of his sisters, which treated of the large fortune left by them and the manner of their living. Morris, during almost all of this period, lived in New York city. The Wendels were a distinctive family in New York. They lived in seclusion in their Fifth avenue residence, or in their summer homes. And yet, despite the newspaper publicity during all of the period up to the time of the death of Ella Wendel, not once did the claimant, according to his own testimony, discover or seek to inquire about his property rights in the various Wendel fortunes, as a son of John G. Wendel.

The other testimony submitted in behalf of the claimant consisted of the statements of witnesses as to admissions of John G. Wendel that he had been married, that he had a son, and declarations by certain persons not related to the Wendel family that Wendel had been married. The latter testimony was excluded by me for reasons discussed in a later part of this decision. Testimony was also submitted by persons who had known John G. Wendel and who testified to the resemblance of Morris, the claimant, to Wendel.

Two other important pieces of documentary evidence have been received in behalf of the claimant. The first is a letter, dated April 6, 1897. It purports to be signed by John G. Wendel. It is addressed to Mrs. Margaret Morris, the alleged foster mother of the claimant, at Dundee, Scotland, and is written from New York city. It speaks of a contemplated visit by the writer to Scotland in May or June of that year. It inquires about his " son " Thomas.

The other important document is a marriage certificate, certifying that John G. Wendel, of New York, and Mary Ellen Devine, of Edinburgh, Scotland, were married on June 11, 1876, at Castle Garden, in the city of New York. The names of two witnesses to the alleged marriage appear upon it and it is signed by " James F. Calhoun, D. D.," described as the pastor of Castle Garden, N. Y., then the place of entry of immigrants in this vicinity.

Three interesting questions as to the admissibility of evidence arose during the trial.

(1) *Pedigree declarations made by persons not related to the Wendel*

*family as to the marriage of Wendel and the paternity of the claimant.* All these declarations were excluded by the surrogate as incompetent under the rule laid down in *Aalholm* v. *People* (211 N. Y. 406); *Matter of Findlay* (253 id. 1); *Eisenlord* v. *Clum* (126 id. 552); *Young* v. *Shulenberg* (165 id. 385); *Washington* v. *Bank for Savings* (171 id. 166); *Blackburn* v. *Crawford* (3 Wall. 175). " Declarations in regard to pedigree, although hearsay, are admitted under the principle that they are the natural effusions of persons who must know the truth and who speak on occasions when their minds stand in an even position without any temptation to exceed or fall short of the truth." The rule as to the admissibility of such declarations is subject to three conditions: (1) The declarant must be dead; (2) they must have been made *ante litem motam, i. e.,* at the time when there was no motive to distort the truth; (3) the declarant must be related either by blood or affinity to the family concerning which he speaks.

Under this third limitation the alleged declarations of Michael Lynch, a former servant in the Wendel family, made to his daughter, were excluded by the surrogate. Similar declarations made by other persons not related to the Wendel family were likewise excluded.

In addition, counsel for the claimant attempted to prove declarations made by Margaret Morris, the foster mother of the claimant, to the effect that the claimant was not the son of her husband, Peter Morris and herself, but was the son of John G. Wendel and Mary Ellen Devine. These declarations were likewise excluded by me, under the rule in the *Aalholm* case, *first,* because, under the claimant's own contentions, Margaret Morris was not related to him by blood or marriage. Although the maiden name of Margaret Morris was Devine, no witness or document in the case has connected Mary Ellen Devine as in any way related by blood or marriage to the Morris family; and, *second,* because the declarant, Margaret Morris, was not proven to have been related to the Wendel family. The relationship of the declarant " to the family which the declarations are intended to affect " must be established. The family thus intended to be affected in this case was the Wendel family, and not the Morris family.

In the *Aalholm* case the claimant, contending that he was a first cousin of the decedent, attempted to prove declarations made by his mother that she had been married to the father of the decedent. No independent proof of the marriage was shown and thereby the declarations were held to be incompetent. Proof of the marriage of the claimant's mother in that case was held to be an essential basis for the admissibility of her statements. Her unsupported decla-

rations that there was a marriage were not competent. The court declared that without such a limitation, a person might establish his relationship to any family which he selected, by simply stating that he had heard from a member of his own family a recital of the facts establishing the desired connection.

Similarly here, the essential element of the marriage of John G. Wendel and Mary Ellen Devine, the alleged parents of the claimant, has not been shown by independent proof. Even if Margaret Morris had been related to Mary Ellen Devine and to the claimant, her declarations would have been incompetent as against the Wendel family. In its discussion of the reasons for this rule, prohibiting the reception of declarations of persons not proven to be related to the family in question, the Court of Appeals in the *Aalholm* case, made the following pertinent and convincing observation: " We live in a state where the social conditions, no less than the rapid growth of our population and the constant increase of similar family names, are urgent reasons for preserving the rule in its integrity. Identity of names, religion and nativity are too common to be alone sufficient evidence of family connections. Any extension of the hearsay rule in regard to pedigree, permitting declarations by persons not related by blood or marriage to the person from whom descent is the matter in issue, would open the door to frauds and uncertainties which should not be invited or encouraged." (*Aalholm* v. *People*, 211 N. Y. at p. 419.)

Certainly, the prophetic wisdom of this rule is demonstrated by the established fraud of the specific claimant here and by the fact that hundreds of claimants, upon no other basis than similarity of their own names or the name of their ancestors to that of Wendel, have made unfounded claims to be next of kin of the decedent. Declarations of a claimant's relations totally lacking in probative force should be logically disregarded.

(2)· *Evidence of repute tending to show that Jonn G. Wendel was known to be married.* Specifically it was attempted to be proven that Mr. Wendel was reputed among his servants and their families to have been married. This testimony was excluded by me. It is undisputed that Wendel lived with his sisters, with every appearance of an unmarried man. His own declarations that he was married or that he was single were admissible. (*Farmers' Loan & Trust Co.* v. *Wagstaff*, 194 App. Div. 757; *Washington* v. *Bank for Savings*, *supra.*) Pedigree declarations by his relations would likewise be competent if brought within the rules previously stated by me. But the rule of evidence which permits testimony as to *repute* and exempts it from the prohibition against hearsay has its limitations. Where the man and woman involved live together, evidence of

repute in the neighborhood as to marriage or non-marriage is admissible. Where the man lives in a locality as a bachelor, without any association whatsoever with the woman, testimony of repute is mere hearsay and is inadmissible (*Badger* v. *Badger*, 88 N. Y. 546, 555), for the reason that the repute thus attempted to be proven is not the product of the cohabitation, and does not tend to explain it or solve its character. In the *Badger* case such testimony of repute tending to show that the decedent was *not married* was held to be incompetent. Here, in the pending case, evidence purporting to establish repute, by servants in the Wendel home, where he lived as a bachelor with his sisters, to the effect that Wendel was *married*, was excluded by me. The rule laid down in the *Badger* case in such a situation would appear to justify the exclusion of any evidence either as to a state of *marriage* or of *non-marriage* where the essential element of known cohabitation was not proven.

(3) *Testimony as to the resemblance of the claimant to John G. Wendel.* Several witnesses for the claimant swore to this facial or physical resemblance. Others, produced by the proponent, testified that there was no resemblance whatsoever. Most of this evidence was received without objection. In my final determination, I excluded all of it from consideration, for the reason that I regard it as inadmissible not only under the rule in this State (*Bilkovic* v. *Loeb*, 156 App. Div. 719; *People ex rel. Fuller* v. *Carney*, 29 Hun, 47), but also because of my general belief that it is valueless. It would be particularly perilous before a jury. There is sharp conflict in the decisions of the courts of the various States and in England as to whether evidence of resemblance is receivable. (Richardson Ev. [4th ed.] 59.) In some jurisdictions when the paternity of a child is in issue, the child may be exhibited to the jury to show resemblance to the putative father, but the youth of the child and the immaturity of its features go to the weight of the evidence. (*Scott* v. *Donovan*, 153 Mass. 378; *Finnegan* v. *Dugan*, 96 id. 197; *Overseer of the Poor, Montclair*, v. *Eason*, 92 N. J. Law, 199; Lord MANSFIELD in the *Douglas* case in 2 Hargr. Collect. Jurid. 386, 402, cited in 1 Wigm. Ev. 396.) In the celebrated *Tichborne Peerage* case in England, which was tried in various phases between 1867 and 1874, evidence of resemblance of the claimant to his alleged father, the decedent, and to the missing heir, was admitted. (8 Am. Law Rev. 1873–1874; Wigmore, Principles of Judicial Proof, 73, 281.) Professor Wigmore in his work on Evidence ([2d ed.] vol. 1, p. 395) analyzes the rules as to the admissibility of evidence tending to show similarity of appearance or of inheritable traits. He argues that such testimony should be competent and its possible abuse should not lead to a rule of absolute exclusion.

The New York rule is to the contrary. That rule is based, as all rules of evidence should be, not upon theory, but upon reason, common sense and experience. Certainly the experience of trial lawyers and trial judges should prevail over theory and hypothesis.

In paternity cases the rule of evidence in our State prohibits the exhibition of the child to the jury to prove resemblance to the alleged father. (*Bilkovic* v. *Loeb*, 156 App. Div. 719.) Evidence of similarity between the child and the supposed father is stated in this decision to be " neither accurate nor reliable." If the evidence is to be excluded where both persons are alive and are before the jury or trial justice, an even more rigid rule should be applied to prevent such testimony in cases where one of the parties is dead and the claimant to the inheritance alone is before the court. In the pending proceeding a parade of witnesses passed before me, who testified to the similarity of appearance of the claimant to John G. Wendel. At most their statements were mere opinion. Eighteen years had elapsed between the date of death of John G. Wendel and the time of the trial. The memories of witnesses testifying to similarity of the claimant were thus subject to the hazards of time. In addition their testimony varied widely as to the particular feature of Wendel's face or form corresponding to those of the claimant. The belief of a witness, though honest, as to the alleged resemblance may be largely a matter of fancy or guess work. Moreover in cases of claims to estates, an impostor might well be selected who in some way resembled the decedent. In *Jones* v. *Jones* (45 Md. 144) the claimant, an adult, contended that he was the legitimate son of the decedent. The testimony of witnesses that in their opinion he resembled the decedent was rejected by the trial court. The ruling was sustained upon appeal in the following apposite and convincing statement on resemblance: " we all know that nothing is more notional in the great majority of cases. What is taken as a resemblance by one is not perceived by another, with equal knowledge of the parties between whom the resemblance is supposed to exist. Where the parties are before the jury, and the latter can make the comparison for themselves, whatever resemblance is discovered may be a circumstance, in connection with others, to be considered. But to allow third persons to testify as to their notions of the resemblance supposed to exist between parties, would be allowing that to be given as evidence upon which no rational conclusion could be based, but which might readily serve to mislead the jury " (p. 152).

It is common knowledge that, despite resemblance by some children to their parents, cases often occur where a child shows no likeness to his brothers or sisters and indicates no resemblance to either the father or the mother. Moreover, doubles of persons (of no

blood relationship), particularly of famous men in history, have not only been found, but have been the subjects of widespread comment and publicity.

In my opinion the reception of testimony as to resemblance, particularly before a jury, would be extremely dangerous. The impostor would necessarily attempt to employ it. The genuine claimant would not need it with the broad opportunity afforded to him to prove his case by more trustworthy forms of documentary and oral proof.

In the *Tichborne Peerage* case and in the pending case the falsity of the story of the pretender, based in great part upon resemblance, was exposed by irrefutable fact and documentary proof. In the *Tichborne* case the pretender in addition was subsequently convicted of perjury and forgery. Cases may occur, however, where strong and convincing proof may be lacking, and the trial judge or the jury might well be led into an erroneous conclusion by testimony of resemblance.

A more subtle form of evidence was introduced into the case upon a new theory of reproducing a sculptured likeness of John G. Wendel. This bust was prepared by a sculptor from certain pictures of Wendel by the so-called method of " dynamic symmetry." He testified that it was possible to create an accurate likeness to the subject of a picture or photograph, preliminarily by the use of mathematical computations and ultimately by the art of the sculptor. The bust was employed to show the resemblance of the claimant to John G. Wendel. If a motion had been made I would have stricken all this testimony from the record. In my opinion it has no value whatsoever as competent evidence. Although the expert who testified in the pending case was evidently inspired by honest motives, the employment of a sculptured likeness of a person (dead for a long period of years), which is prepared shortly before or during the trial of a case, lends itself to obvious abuse, for the reproduction might be made to look more like the claimant than the decedent.

Let us now consider the evidence submitted by the proponent of the will in opposition to the contentions of Thomas Patrick Morris. That evidence completely destroys the claim of Morris that he is the son of John G. Wendel. It shows clearly that the four most important pieces of evidence relied upon by him, the letter dated April 6, 1897, the letter of March 1, 1901, and the so-called will both contained in the book, the " Blockade of Phalsburg," and the alleged marriage certificate, are fabrications. It has been clearly proven that John G. Wendel could not have visited Scotland, as claimed by Morris, between the year 1879

and the year 1902. Thousands of documents, including checks, check stubs and notations and entries in the handwriting of John G. Wendel, have been received in evidence. They have been analyzed and summarized in an exhibit which covers every activity of his from 1879 to 1902. This exhibit covers almost a day to day record of his conduct during this entire period. All this documentary evidence shows Mr. Wendel's presence in New York city, or in Quogue, Long Island, his summer home, continuously during these years. Added to it is the evidence of witnesses who testified that to their knowledge he remained within the boundaries of New York State and never was known to visit Scotland.

Morris' statement that he saw Wendel in 1909 at Clifton, Ariz., is likewise untrue and is overcome indubitably by the documentary evidence showing Mr. Wendel's continuous activities in New York during that year. The claimant's recollection was that Mr. Wendel traveled on this trip in 1909 in the private car " Buffington." The records of the Pullman Company show that the construction of this car was not completed until three years later, in January, 1912. Morris apparently discovered or was informed that Mr. Wendel had used this car on a trip to California in later years shortly before his death, but Morris, without verifying the fact that it was not in existence in 1909, attempted to lend plausibility to his story by this ·falsehood.

Morris' story that he visited the Wendel home at No. 442 Fifth avenue in March of 1908, and saw Ella Wendel there has been broken down by two lines of proof. The documentary records of his employment with the Arizona Copper Company, and his own testimony, have established that he was either *en route* to or actually in Arizona during that entire month. The documentary proof also established that Ella Wendel was in Europe during, and for some months before and after, March, 1908. His visit to her in New York city at that time could not have occurred.

The letter produced by the claimant and purporting to be written by John G. Wendel, dated April 6, 1897, to Morris' foster mother in Dundee, Scotland, and referring to him as his " son," has likewise been proven to be a fabrication. Certain circumstances connected with it not only arouse suspicion, but establish convincingly that it was manufactured as a piece of evidence in this case. Although there is indication of purposed simulation, when comparison with the authentic handwriting upon checks and other documents is made, the letter itself is clearly shown not to be in the handwriting of John G. Wendel. It is supposed to have been found in 1931 in Scotland by a member of the Morris family, after the assertion of this claim. The upper part of the envelope, which

might have had upon it the stamp and postmark, has been suspiciously torn off. Elbridge W. Stein, an expert of long experience on handwriting and questicned documents, testified that the letter and the address on the envelope were written within recent years and that both had been treated by an artificial process in an attempt to indicate age. The author of the letter made one slip, which is typical of the errors of even the most careful conspirators in such situations. A mistake of this character eventually leads to the exposure of the fraud. The letter is addressed from No. 175 Broadway, and is dated 1897. In that year the Wendel office was at No. 79 Maiden Lane. The office at No. 175 Broadway was not established until 1900 — three years after the purported date of this letter.

It has also been conclusively proven that the alleged will contained in the book "The Blockade of Phalsburg," by which "Wendel" bequeathed all his property to Morris, the claimant, is a forgery. In its manufacture certain elements were worked into it to give to it the appearance of plausibility and reality. Thus, the names of two former servants of the Wendel family, Michael Lynch and Richard Lundy, were used as subscribing witnesses. The person who drew it must have been familiar with the Wendel household in 1901. Moreover, both of these alleged witnesses are dead. The name of the third subscribing witness is that of an employee of a hotel in the neighborhood. Probability of genuineness was thus again attempted. But this alleged witness did not appear and was not accounted for on the trial. The signatures of Lynch and Lundy are plainly simulated, but when compared with their authentic signatures produced from savings bank records, the conclusion is inevitable that the names of these two witnesses were forged. No authentic signature of Dietoch, the third subscribing witness, is in evidence. The draftsmanship of the alleged will, the spelling and handwriting are those of an uneducated person and one possessing qualities entirely foreign to those of the real Wendel. The latter was a highly educated man. His authentic letters and writings show precision, education, care and culture. The handwriting and signature contained in the alleged will are unlike the authentic writing and signatures of the real Wendel. In my opinion this document is a palpable forgery.

It has been proven beyond dispute, and at the trial was even conceded by the attorney for the claimant himself, that the alleged marriage certificate, certifying to the marriage of John G. Wendel and Mary Ellen Devine, is a forgery. Two witnesses' names appear upon the certificate, neither of whom has been accounted for. The minister who is supposed to have performed the ceremony, a Dr. James F. Calhoun, has in no way been identified as ever

having existed. There has been placed in evidence before the surrogate indisputable documentary proof that this certificate, although dated June 11, 1876, was not printed until the year 1913. The certificate was cut or torn from a Bible printed by A. J. Holman & Co., a firm of Bible publishers in Philadelphia. The firm has been in that business for almost fifty years. Its records were kept with extreme care. Whenever an order was given for the printing of an edition of certificates, a copy of the certificate actually printed at the time was kept with the order. These printers' proofs or copies were produced in evidence. A series of fourteen Bibles containing forms of marriage certificates and printed from time to time by the company was also received in evidence. The plate from which the disputed certificate itself was printed was likewise submitted as part of the proof. The deterioration of this plate, in the process of handling and printing, fixed clearly and definitely the time within which the certificate in dispute was printed. Certain characteristics upon it, including broken letters, scratches, the type of certain words, and the appearance of the dotted lines, show that the disputed certificate was printed between the years 1913 and 1923. Some of these defects in the plate were not present in the earlier printings. More pronounced and different changes occur in printings after 1923.

The certificate under microscopic and stereoscopic examination shows that it originally contained the printed date line " 19..." The paper was torn in pieces which were pasted together at some time before the beginning of the trial. A significant tear, purposely done, removed part of the figure " 9 " in the date line, but not all of it. After the parts were pasted together, the figure " 8 " was written over the remnants of the " 9 " in order to make the date 1876. These remnants of the original printed figure " 9 " are, however, clearly discernible. The testimony of Mr. Stein, the expert on questioned documents, was particularly convincing upon this phase of the case. It constitutes, however, more of a thorough analysis and argument, for the appearance of the certificate itself furnishes the strongest proof that it was printed and published not earlier than 1913, over thirty years after the date — (1876) which has been written in it.

Not only has it been shown that this document was spurious, but it has been clearly established that its alleged finding in Scotland in 1931, after the assertion of the claim of Thomas Patrick Morris, was deliberately designed to make possible the reception of the certificate under the rule of evidence relating to an ancient document.

Upon the face of that certificate it appears that the alleged wife of John G. Wendel was Mary Ellen Devine. Not a single

witness has testified to the identity of Mary Ellen Devine or that she ever existed. Aside from the certificate and the story of the claimant no association has been indicated between her and John G. Wendel. She floats like a wraith or a ghost across the drama of the trial. The maiden name of Margaret Morris, the foster mother of the claimant, was Devine, but neither the claimant nor his sisters or brother-in-law who have testified in the case, have identified her as being of any relationship whatsoever to Margaret Devine Morris. There was not a single bit of evidence in the case to show that John G. Wendel ever associated with Mary Ellen Devine.

The motive for the assertion of the claim of Thomas Patrick Morris here is more sinister than appears upon its face. His alleged father died intestate and left a substantial fortune. In the absence of a will, John G. Wendel's sisters took his estate as next of kin and heirs at law. Much of his intestate property found its way into Ella Wendel's estate. If Morris had succeeded in establishing his relationship as the son of John G. Wendel, he would have been entitled to his entire fortune as his sole next of kin and heir. It would have been comparatively simple to have followed and identified John G. Wendel's property, mostly real estate, within Ella Wendel's estate. Without even the necessity of contesting her will, he would have been able to obtain property of the value of at least ten million dollars. In addition, he would have been afforded an opportunity of contesting the validity of her will with respect to the remaining thirty millions left by her. The stake to be won was large and the circumstances strongly indicate that he was not alone in the scheme. Plainly a person familiar with the law played an important part in the conspiracy. In justice to the two attorneys for the claimant, who appeared in this proceeding it should be stated that there is no evidence showing that they were parties, directly or indirectly, to this fraud.

One other element in the case requires consideration. Morris, when originally examined as a witness, testified in answer to a question by his own attorney that he had never been convicted of a crime. An adjournment was necessary to take the depositions of certain witnesses in Scotland. Upon the resumption of the trial, and apparently in fear of the result of an investigation made by counsel for the proponent, he voluntarily admitted that he had been convicted, some years ago, of the crime of compounding a felony. It is unnecessary to stress further contradictions and other phases of the claimant's case which have been shown to be false. The entire record points with overwhelming force to the following conclusions: That no marriage ever took place between John G.

Wendel and Mary Ellen Devine; that Thomas Patrick Morris is not the son of John G. Wendel; that Thomas Patrick Morris is not the lawful nephew of Ella Wendel, the decedent here; that he is not a person interested in this estate because he is not a next of kin or heir at law of Ella Wendel.

In view of the extraordinary circumstances in the case, the surrogate has directed that the testimony and the exhibits be transmitted to the district attorney of New York county for appropriate action by him. As a protection to the genuine beneficiaries of all estates, of great value or moderate or small, and as a warning against the repetition of similar attempts to defraud, the situation here should be acted upon promptly and effectively.

Order striking out the appearance of Thomas Patrick Morris as a party signed.