Betty Beuschel, Plaintiff, *v.* Jacob Manowitz, Defendant.*

Supreme Court, Kings County, January 2, 1934.

*Guarino & Mulry* and *Sidney I. Prager*, for the plaintiff.

*Morris A. Vogel*, for the defendant.

Steinbrink, J. This is an action for damages for a carnal assault alleged to have been committed by the defendant, as a result of which it is claimed that the plaintiff gave birth to a child. The child is now two years of age. The defendant, denying all of the material allegations of the complaint, moves for an order requiring the plaintiff and her child to submit to a physical examination pursuant to the provisions of section 306 of the Civil Practice Act, and, in connection therewith, to permit the taking of samples of blood of the plaintiff and her child for examination and analysis. The examination sought is clearly relevant on the issue of paternity.

On the argument of the motion plaintiff's counsel urged that the exhibition of the child to the jury would in and of itself demonstrate by facial resemblance the defendant's paternity, and that the

---

* Revd., 241 App. Div. 888. See, also, *Matter of Beuschel* v. *Steinbrink*, 241 App. Div. 746; *People ex rel. Beuschel* v. *Manowitz*, 241 id. 772.

examination now sought is, therefore, unnecessary. The complete answer to this argument is the rule of evidence in this State, which prohibits in paternity cases the exhibition of the child to the jury for the purpose of showing resemblance to the alleged father. This rule is based upon the belief that such evidence is neither accurate nor reliable. (*Matter of Wendel*, 146 Misc. 260; *Bilkovic* v. *Loeb*, 156 App. Div. 719.) The question to be determined on this application is whether the Landsteiner blood-grouping test, which is here sought to be applied, is generally recognized as sufficiently trustworthy for use as an aid in ascertaining facts in a legal proceeding. If so, then by general common-law principles the proposed examination should be permitted. Law and jurisprudence, which are something more than the dry tomes of the past, can be understood by considering fundamental principles not only of government and economics but also at times by giving consideration in particular cases to sociology, medicine, or other sciences, philosophy and history. New concepts must beat down the crystalized resistance of the legally trained mind that always seeks precedent before the new is accepted into the law. Frequently we must look ahead and not backwards.

In the instant application the court is not proceeding to anticipate scientific facts, but rather to act judicially upon the basis of scientific facts already ascertained. Speaking before the New York Academy of Medicine, BENJAMIN N. CARDOZO, then Chief Judge of the Court of Appeals and now Associate Justice of the United States Supreme Court, said: " We turn at times to physiology or embryology or chemistry or medicine — to a Jenner, or a Pasteur, or a Virchow, or a Lister, as freely or submissively as to a Blackstone or a Coke." And he pleaded for a friendliness between the medical and legal professions in " a common quest, the quest for the rule of order, the rule of health and disease, to which, for individuals as for society, we give the name of law." Evidence there is in abundance of medicine's contribution to the growth of the law.

In *People* v. *Schweinler Press* (214 N. Y. 395) the highest court of this State upheld legislation enacted for the protection of women working in factories. Similar legislation was upheld by the United States Supreme Court, and, in doing so, resort was had to both the testimony and the writings of the medical fraternity. It is inconceivable that without contribution from the medical profession there would ever have been adopted in this State, as part of the Farms and Markets Law, the provision for the inspection of cattle, subjecting them to tuberculin tests and, if found infected, destroyed. In the case of *People* v. *Teuscher* (248 N. Y. 454, 463) the opinion discusses the basis for the legislation, and says: " More

and more, in its social engineering, the law is looking to co-operative effort by those within an industry as a force for social good. It is harnessing the power that is latent within groups as it is harnessing the power in wind and fall and stream." This applies with greater force to the professions of medicine and law than it does to co-operative effort in any industry. Through these and similar decisions, law and medicine were marching hand in hand. With the advance made in the field of medicine, further legal progress is to be observed. Slowly but surely we move from postulate to ultimate.

The law has at all times, even though on occasions haltingly, appreciated the need of keeping abreast of achievements in fields other than its own. It has thus recognized as trustworthy, and has made use of, numerous scientific advantages. The Binet-Simon Intelligence Test was used during the course of a Connecticut trial (*State* v. *Wade*, 96 Conn. 238; 113 A. 458). Experts are permitted to testify that a given specimen of blood is human. (*People* v. *Roach*, 215 N. Y. 592; *Commonwealth* v. *Sturtivant*, 117 Mass. 122; 19 Am. Rep. 401.) Evidence of fingerprints is admitted to prove identity. (*People* v. *Roach*, *supra;* *State* v. *Cerciello*, 86 N. J. Law, 309; 90 A. 1112.) In the *Roach* case, Judge SEABURY, writing for the Court of Appeals, said: " In view of the progress that has been made by scientific students and those charged with the detection of crime in the police departments of the larger cities of the world, in effecting identification by means of finger-print impressions, we cannot rule as a matter of law that such evidence is incompetent. Nor does the fact that it presents to the court novel questions preclude its admission upon common-law principles." (215 N. Y. 604.)

There was a time when the courts refused to order an X-ray of a plaintiff-claimant in a personal injury action. (*Gregory* v. *Acme Road Machinery Co.*, 175 App. Div. 473.) But this ruling has since been abandoned in *Hollister* v. *Robertson* (208 App. Div. 449). No one will gainsay the fact that section 306 of the Civil Practice Act is now regarded as sufficiently broad to permit X-ray photographs for use in legal proceedings. Naturally, the courts will not permit the application of scientific tests which have not attained definite and dependable results accepted generally by those qualified to judge. So we find a Federal court refusing to permit the use of the systolic blood-pressure deception test because it had not gained sufficient recognition. (*Frye* v. *United States*, 293 Fed. 1013; 54 App. D. C. 46.)

The same arguments which might be advanced against the test here sought have, from time immemorial, been urged whenever a

step has been taken which marked progress; but the law is not static. In *Hayt* v. *Brewster, Gordon & Co., Inc.* (199 App. Div. 68, 72) an application was made under section 873 of the former Code of Civil Procedure for a blood test as supplementing a physical examination of a plaintiff. The application was denied at Special Term, but the Appellate Division reversed the order and granted the motion " under such restrictions and directions as to the court * * * shall seem proper." There, as here, it was necessary by needle puncture to draw blood in a sufficient quantity for the test.

In the affidavits submitted in opposition it is not claimed that either plaintiff or child would, in the slightest degree, be injured by being submitted to a blood test, so that the examining physician may be aided in qualifying himself to testify as an expert at the trial. The plaintiff's affidavit frankly states that she " would for the benefit of science, as well as for the purpose of aiding the progress of law, be willing to submit " herself " and the child to a test, provided certain astringent conditions are laid down."

Research of medical journals and foreign law reports discloses that many thousands of similar cases have been before the courts of European nations. The Landsteiner blood-grouping test is generally accepted by the medical profession. A complete reading of the pamphlets submitted on the hearing of this motion and reference to scientific works cited in support of the application lead to a conclusion in keeping with that of the Supreme Italian Court of Cassation (Lattes, Individuality of the Blood, p. 254), where the following appears: " As regards the reliability of the results obtained by this method the latest studies and investigations show that though the determination of the blood groups affords no positive evidence for a declaration of filiation in a given case, it does, on the other hand, furnish incontrovertible evidence for the exclusion of this relationship when the child's blood group does not agree, according to a definite scheme, with that of the supposed father."

Cases of disputed paternity are not new, and for many years the courts on the one hand and science on the other have struggled for a solution. As early as 1808, in the case of *Commissioners of the Almshouse* v. *Whistelo* (3 Wheel. Cr. Cas. 194) the court, in the light of the scientific knowledge of that day, was concerned with the question of hereditary influences for the purpose of ascertaining the paternity of a child. A reprint from the *London Law Times*, which appeared in the *New York Law Journal* on February 13, 1932, reveals that in two criminal cases in England (*Rex* v. *Blakeman*, Leeds Assizes; *Rex* v. *Kell*, Winchester Assizes) evidence was proffered to show that the bloodstains on the prisoner's clothing were of the same group as the stains on the victim's clothing.

This Landsteiner blood-grouping test found practical application in the city of Chicago on the occasion of a mixing of two new-born infants who, through the results of the tests, were restored to their rightful parents, and also it was recently applied in the Court of Common Pleas in New Haven county, Conn., in a filiation proceeding.

While the results of X-ray tests are readily admitted into evidence, Roentgenologists at a trial frequently disagree in their interpretation of plates. This fact of disagreement should not influence the court in passing upon the order providing for the X-ray, since experts must state their conclusions at the trial. It is for the trier of the fact to accept or reject such conclusions. So, here, it will remain for the physician and scientist, who will be subject to examination and cross-examination at the trial, to demonstrate the correctness of their conclusions.

Reason and the exigencies here fully justify the granting of the application, but, of course, the order to be made will contain such restrictions and directions as to the court may seem proper. Let counsel appear at my chambers at a time agreed upon, and the order and procedure will then be determined.