## Commonwealth, ex rel., v. Visocki

*Lawrence B. Cook*, for plaintiff.
*Don F. D'Ivernois*, for defendant.

KENNEDY, P. J., February 4, 1935.—This is an action for nonsupport on an information made by the wife on October 9, 1933. Various hearings were had in the case.

The testimony shows that the prosecutrix and defendant were married on May 9, 1933; that the prosecutrix is 20 years of age and the defendant 42. There was a conflict in the testimony between the parties as to actual intercourse, the husband testifying that he never had any intercourse with his wife because he heard the evening

of their wedding day that she was pregnant. The prosecutrix testified that she had intercourse with her husband but once, the Saturday after they were married. They however lived together 4 months. It is practically conceded that the child was born in wedlock 7 months after conception. The presumption is therefore that the child is the legitimate offspring of the parents, and to overcome this the defendant, denying the paternity of the child, has introduced scientific testimony to show by what is popularly known as a blood test that there is no strain of his blood in the child and that therefore he is not the father.

In support of defendant's position he introduced, in addition to numerous pamphlets and medical publications, Dr. Ernest W. Willets and Dr. Henry M. Ray. Dr. Willets testified that he had been a practicing physician in Allegheny County for 29 years, specializing in laboratory work, particularly all kinds of blood tests; that the prosecutrix and her child were sent to him by John D. Meyer, Esq., (who appeared for the prosecutrix at the hearing November 9, 1933) ; that at his request he made a blood test of the prosecutrix and the child on March 27, 1934; that he personally made the tests; and that on April 6, 1934, he made a blood test of the defendant. He further testified that human bloods fall into four distinct groups recognized by all blood authorities; that the characteristics of these groups are transmitted from parents to offspring, according to certain definite laws, and by ascertaining the group to which the blood of one person belongs, and knowing the group to which the blood of a second person belongs we can tell in certain cases whether or not it is possible for a third person to be the other parent of the child. He testified also that he found the prosecutrix belongs to group 4 Moss, also known as Landsteiner group O, these being identical; that the child belongs to the same group as the mother; that the defendant, the alleged father, belongs to group 1 Moss,

or group A-B Landsteiner; and that "if this child known as Ethel Visocki is the daughter of this woman, Mrs. Visocki, then this man, Frank Viscoki, could not be the father of that child."

Dr. Ray testified that he had been a practicing physician in Pittsburgh for 13 years in diagnostic and clinical pathology; that he had made many blood tests for blood grouping for transfusion, but for paternity tests in about three other cases; that both tests are identical; that in March 1934 he took blood tests of the defendant, the prosecutrix, and the child at his office, the wife and child being accompanied by their physician, Dr. Arnold; that he found the child to be in group 4 Moss, or group O Landsteiner, the wife in identically the same group, the husband in group 1 Moss or group A-B Landsteiner (these being the same as found by Dr. Willets); and that on the basis of blood group studies the father in group 1 Moss could not be the other parent of this child.

This witness, with whose appearance and testimony the court was much impressed, testified that there is a small group of cases, to be exact 14 percent, where the tests fall into certain groups, where the results can be interpreted as absolute, and this particular case falls into that 14 percent where we can state, where the mother is group O and the child group O Landsteiner, the father cannot be group A-B Landsteiner; that in a great percentage of cases, the determination of blood groupings, for the purpose of determining legitimacy, can only exonerate, but cannot incriminate: "In other words, I can say that this child can possibly be the child of this man and woman, but there are other men and women in the same groups who may be the father and mother of the child too. Now we have certain combinations of groups, which amount to about 14 percent, where we can state definitely whether a child is legitimate or not. The blood groupings in this particular case fall within that 14 percent—that it would be very difficult to explain the dif-

ference between the 14 percent and the remaining 86 percent unless you had a basic knowledge of the technique of the thing and a knowledge of the inherited factors. This case falls within the 14 percent where I can conscientiously state according to the blood groupings, this man, Mr. Visocki, would not or could not be the father of this child."

On being asked if there were any school or class of physicians that might not accept this proposition, the witness answered: "I have never heard that point argued in scientific circles." On cross-examination the witness said: "These groupings are not theories, they are scientific facts"; that he did not know exactly when these examinations began for the purpose of determining the legitimacy of children, but certainly within the last 10 years. On being again called to the stand on a subsequent hearing, Dr. Ray further testified that the validity of the dominance rule which is the basis in the grouping of blood as it applies to the determination of legitimacy, in affiliation cases, and as it applies to the grouping of blood for transfusion and as it applies in criminology, is universally recognized by the orthodox medical profession of Europe and of the United States. It is accepted by the Committee of Hygiene of the League of Nations. It is accepted by the American Society of Pathologists and Bacteriologists and by the National Research Council of Great Britain.

There is no school of pathologists that differs so far as the basic principles of the application of this test is concerned. It is not only a theory, but the fact is there are certain basic, fundamental, indisputable, biological facts that we can demonstrate 100 percent every time in the transmission of the dominant and recessive factors of this blood grouping. This is not theory. The theory is simply different attempts to explain; just the same as we know the force of gravity is a fact and yet we have theories that attempt to explain that force of gravity.

The blood groupings of the three individuals involved in this case fell in that 14¾ percent of cases where it was possible to state definitely that the blood group as found in the child was definite evidence of the fact that the man with the group that he had could not have been the father.

The defendant further introduced in support of his contention defendant's "exhibit A", Journal of the Medical Association, issue of October 6, 1934, pp. 1042 and 1043, the most recent article in the matter of blood tests, and in order to facilitate the hearing, counsel for the defendant, with the consent of the counsel for prosecutrix, proposed to include these other books in the brief rather than introduce them as evidence at this time.

For the prosecutrix the Commonwealth called to the stand Dr. C. N. Schildecker, who stated that he was a practicing physician in the City of Pittsburgh for over 30 years; that he has been on the surgical staff of the West Penn Hospital since 1908; and that he is familiar with human blood tests. Over an objection by the defendant to the question, the witness said: "In my opinion no such test is at all conclusive and as I see it in my reading of the literature and contact with my brother physicians that no such theory or opinion is accepted, that in my opinion such a set of circumstances, the mother group 4 Moss, the child the same group, and the father group 1 Moss, means nothing—not capable of any proof. These assertions regarding blood and blood typing in relation to paternity are theoretical. There have not been enough of them done, and what have been done have led to inconclusive opinions of theories. It is very controversial, the whole proposition, and that is admitted by one of the outstanding men of the country, Dr. Sanford B. Hooker, who in one of his works states in italics, 'Blood grouping tests can never affirmatively fix paternity on a man. They may exonerate him.'"

These were the only three witnesses who were called

to testify as to the importance or authority of blood tests to determine or, as counsel for the defense states the question, to exonerate the defendant from the charge of being the father of the child in question.

In our opinion, comparing the positive, not to say aggressive, circumstantial, and particular testimony of the witnesses for the defendant with that of the witness for the prosecution, which seems to us to be more general, lacking in individual and concrete authority for his position, the strong weight of the evidence upholds the contention of the defendant, who has sustained the burden which the law casts upon him, he being the husband of the woman who gave birth in lawful wedlock to a child, that he is not the father of the child.

Counsel for the defendant in their brief say the question involved in this case, so far as American jurisprudence is concerned, is a most novel one and has never been determined, so far as search goes, by any court of last resort in this Commonwealth, nor in the United States, and that the important duty of determining this question falls upon this court for the first time. They further state the question of blood test has arisen in four cases in the United States, none of which are in point but are discussed here for the possible and probable analogies that may be drawn therefrom.

One is Commonwealth v. Zammerelli, 17 D. & C. 229 (1931), in which the defendant was charged with fornication and bastardy. To combat the bastardy charge, Dr. Heise, a pathologist at the Uniontown Hospital, was called as an expert witness. In detail he gave the nature of the blood test, with the conclusion that the parentage of a child cannot be determined by a blood test, but nonpaternity, in certain instances, can be established, citing the American Medical Journal, vol. 93, page 612 (1929). This case is cited somewhat at length with other authorities. The jury brought in a verdict of "guilty", which was set aside by the court for the reason

that no scientific opinion was offered in contradiction of the testimony of the defendant, and a new trial was granted to enable the Commonwealth to contradict this evidence by additional tests, if desired.

In the case of Beuschel v. Manowitz, 151 Misc. Rep. 899, 271 N. Y. Supp. 277, which was a case concerning the birth of a child, on the question whether the court should order the plaintiff and child to submit to a physical examination, the court sustained the defendant's motion to have the Landsteiner blood grouping test applied, saying the court is not proceeding to anticipate scientific facts, but rather to act judicially upon the basis of scientific facts already ascertained.

In People v. Charles Schweinler Press, 214 N. Y. 395, the court said the law has at all times, even though on occasions haltingly, appreciated the need of keeping abreast of achievements in fields other than its own. It has thus recognized as trustworthy, and has made use of, numerous scientific advantages, instancing the Binet-Simon intelligence test; experts to testify that a specimen of blood is human; the admission of fingerprints to prove identity; and the x-ray.

Counsel for the defendant further cite a great number of printed authorities—thirty in fact—sustaining their position, which for lack of time and space will not be cited here.

Taking into consideration the authoritative preponderance of the evidence for the defendant, we are of the opinion that he is not the father of the child in question and that therefore neither the prosecutrix nor her child is entitled to support from him, and the case should be dismissed.

*Order*

And now, to wit, February 4, 1935, case dismissed.