OPINION OF THE COURT
Patricia E. Gallaher, J.
This case prevents the complex question of whether it would be in the best interests of the two subject girls to ignore racial facts and conclusions that will appear obvious to virtually anyone seeing the parties and subject children, when ruling on a paternity claim made against a marital presumption of legitimacy. Here, the dark-skinned and apparently African-American petitioner Damien filed to be declared the father of the two young girls who are legally the daughters of respondents J.G. and C.G. (hereinafter the respondent shall be Mr. G.). Mr. and Mrs. G. both clearly appear to be Caucasian. The very act of filing such a petition given the apparent races of the parties suggests that the two girls apparently look as if their father is African-American, and indeed, the Attorney for the Children has represented to the court that they look Hispanic.
Judicial notice may be taken of facts which are either notorious or manifest.[1] While the race of each of the parties is not noted in the paperwork, the court takes judicial notice of each adult’s race for the purpose of this motion to dismiss, as it would do so at any evidentiary hearing. This aspect of the case is unavoidably obvious, and this court believes these facts as to race are not only obvious but relevant to the paternity issue. Simply ignoring the apparent racial identities of the parties and the children would not make the racial aspects of this case disappear no matter how hard anyone might wish otherwise, and no matter how quickly or slowly racial discrimination and consciousness is receding as an issue in our society. A person’s racial appearance is as obvious as gender, height, and age — i.e., not necessarily perfectly clear factually, but the visual information is there to be seen by everyone.
*245 In this unusual legal case, C.G. (date of birth Apr. 2007) was born approximately seven years after the G.s were married, having been conceived and born while Mr. and Mrs. G. were living together as husband and wife. A year later, Mrs. G. gave birth to a second daughter, K.G. (date of birth May 2008). Again, the G.s were married and living together at the time of the conception and birth of this second girl. The court is advised and it is not disputed that Mr. G., the mother’s husband, is listed as both girls’ father on their birth certificates. Indeed, he is legally presumptively the father of the girls by virtue of his marriage to the mother.[2] Furthermore, the children have resided with the G.s throughout their lives. It is black letter law that the marital presumption applicable here is, however, a rebuttable presumption. Mr. Damien seeks to rebut that marital presumption via this proceeding.
Motion to Dismiss Paternity Petitions
The Attorney for the Children has moved to dismiss Mr. Damien’s paternity petitions or, in the alternative, for a hearing to determining whether having a genetic marker test, as sought by the petitioner, is in the best interests of the children, ages five and four at the time of the filing. The mother’s attorney supports the motion and seeks dismissal of the petition. The attorney for the mother’s husband supports the motion seeking dismissal, and alternatively urges that the court find that equitable estoppel prohibits the use of a genetic marker test. For the reasons set forth below, the court denies the motion to dismiss, and also denies the request for a best interest hearing. Instead, this court orders that the genetic marker test of the mother, the petitioner and both subject children be held.
The court finds that a hearing is not needed in this regard, despite the assertion of equitable estoppel and the applicable presumption of legitimacy, given the conceded and agreed critical facts of the case as understood by the court and discussed below. However, if any party disputes a key fact that is part of the basis for this decision that a hearing is not required, the court would reconsider holding an evidentiary hearing. A request for such a hearing based on such a contested and relevant fact should be submitted within 10 days of service of this decision *246 upon the attorneys for the parties — or this court will consider that no such disputed, critical fact exists and no hearing will be held.
Critical, Undisputed Facts
It has been admitted in various court appearances and in affidavits that both girls call both Mr. G. (i.e., their mother’s husband) and Mr. Damien “Daddy,” that both girls routinely visit the petitioner by agreement between the parties, that they both enjoy those visits, and that the petitioner pays child support — and the G.s accept his child support — for C.G.’s and K.G.’s support. According to the Attorney for the Children, “the first man they identify as their father is Mr. G., with whom they live, and they acknowledge Mr. Damien as their ‘second father.’ ” The court has been advised by the Attorney for the Children that both girls, rather than looking Caucasian, in her opinion, look “Hispanic.” Given the apparent race of the named parties and the above-stated facts of this case this “Hispanic” appearance is not surprising. Indeed, it has been implicit from all the proceedings in this case, from the very beginning, that the adult parties all act as if the petitioner, Mr. Damien, i.e., the so-called “second father,” is the biological father even though the legal father, Mr. G., is the day-to-day father. The belief that the petitioner/Mr. Damien is the biological father is implicitly the basis for his visitation with the girls, his payment of child support for the girls, and his being called “Daddy.” If he were not believed to be the biological father, it is logical to assume that he would have no visitation, pay no child support, and not be called “Daddy.” If the genetic marker test establishes that he is in fact not the biological father, he would not have a right to visitation or an obligation to pay child support.
Discussion
The presumption that a child born during marriage is the biological product of the marriage has been described as “one of the strongest and most persuasive known to the law” (Matter of Findlay, 253 NY 1, 7 [1930]). “However, this presumption may be rebutted by clear and convincing evidence excluding the husband as the father or otherwise tending to disprove legitimacy (see Matter of Walker v Covington, 287 AD2d 572 [2001]; Fung v Fung, 238 AD2d 375, 376 [1997])” (Matter of Barbara S. v Michael I., 24 AD3d 451, 452 [2005]).
There is old and long-standing case law that a child’s appearance is not to be considered on issues of paternity. This goes *247 back to the era of blood-grouping tests, which were not nearly as helpful as today’s incredibly decisive genetic marker tests (e.g. Bilkovic v Loeb, 156 App Div 719 [1913]; Matter of Theresa J. v Troy M., 89 Misc 2d 909 [Fam Ct, NY County 1977]; Matter of Wendel, 146 Misc 260 [1933]; Beuschel v Manowitz, 151 Misc 899 [1934], revd on other grounds 241 App Div 888 [1934]; see Symposium on the Emerging Issues in the Rules of Evidence: Federal and New York, New York Law of Evidence, 9 St John’s J Legal Comment 289, 293 [fall 1993]; Annotation, Admissibility and Weight of Evidence of Resemblance on Question of Paternity or Other Relationship, 95 ALR 314; William H. Danne, Jr., Annotation, Bastardy Proceedings: Propriety of Exhibition of Child to Jury to Show Family Resemblance, or Lack of it, on Issue of Paternity, 55 ALR3d 1087).
However, the court is unaware of any case law which says the apparent race of a child is required by law to be ignored on issues of paternity. Indeed, the case law allows race to be considered. (See Department of Pub. Welfare of City of N.Y. v Hamilton, 282 App Div 1025 [1st Dept 1953] [holding that expert scientific testimony was allowed to show in “course of nature” it would be impossible or improbable for defendant to have begotten a child having certain racial characteristics displayed by a child whose paternity was at issue]; cf. Matter of Commissioner of Social Servs. v Ernest HH., 195 AD2d 738 [3d Dept 1993] [holding that in a paternity case a woman may be able to show that one man she slept with during the period of conception could not be the father because he has racial characteristics markedly different from the child]; see People v Horace, 172 Misc 2d 270 [Sup Ct, Monroe County 1997]; Matter of Theresa J. v Troy M., 89 Misc 2d 909 [1977]; 46 NY Jur 2d, Domestic Relations § 859; Jonathan M. Purver, Annotation, Race or Color of Child as Admissible in Evidence on Issues of Legitimacy or Paternity, or as Basis of Rebuttal or Exception to Presumption of Legitimacy, 32 ALR3d 1303.)
Furthermore, modern genetic marker paternity tests by certified laboratories are so accurate that they routinely indicate either (1) that the putative father has a 0% likelihood of being the biological father — i.e., is not the father, or (2) that the putative father is more than 99.9999% likely to be the father, i.e., that he is the only one of hundreds of millions of men likely to be the father.
According to Family Court Act § 532 (a), “No such [genetic marker] test shall be ordered, however, upon a written finding *248 by the court that it is not in the best interests of the child on the basis of res judicata, equitable estoppel, or the presumption of legitimacy of a child born to a married woman.” Furthermore, if the test indicates “at least a ninety-five percent probability of paternity, the admission of such record or report shall create a rebuttable presumption of paternity, and shall establish, if unrebutted, the paternity of and liability for the support of a child.”
It is this court’s actual experience that genetic marker test results essentially determine the question of paternity in litigated matters.[3] As a matter of practice, no factual trial is requested after genetic marker test results are received because of the accuracy of the tests. Instead, either (1) an order of filiation is routinely entered by consent based on the genetic marker test results, or (2) the paternity case is dismissed as the putative father is excluded as a possible biological father. This case would presumably have such a result if the test were administered to petitioner, mother and children — i.e., Mr. Damien would be eliminated as the possible father or found to be approximately 99.999% likely to be the father.
Additionally, the adults’ history of behavior all points to a likelihood that the petitioning Mr. Damien is the biological father of the subject children, and the children’s behavior indicates they understand that he is their biological father to the extent children are able to do so. Indeed, while the G.s’ marriage is intact despite the seemingly apparent birth of two children during the marriage fathered by a man other than Mr. G., the G. family cannot be accurately viewed as an intact family — despite the Attorney for the Children making that argument. Indeed, the adult parties have all actually behaved for years as if the petitioner is the biological father of the children, with the rights and responsibilities of fatherhood — albeit without an order or written agreement. Thus, this case is really an example of the typical case in which children live in one home with one biological parent and visit the other biological parent in another home.
It is significant that this visitation/child support situation continued for years without court involvement. Obviously, this situation might well have gone on for even more years without court intervention as is often done in cases with children born out of wedlock. However, for some reason, the petitioner filed to *249 establish his rights legally, rather than count on the continuing cooperation of Mr. and Mrs. G. It seems likely that the petitioner/Mr. Damien realized that without paternity and visitation orders to protect his interest in seeing the girls, Mr. and Mrs. G, as legal parents, could at any time move away and leave him with no contact with two girls whom he believes to be his biological children and with whom he has a long-standing father/daughter relationship. Whatever his motivation, he filed his petition to be legally declared the father of the two girls.
It is common knowledge that a child of one Caucasian parent and one black/African-American parent would not be likely to look Caucasian though it is possible. Indeed, such children often appear to be darker skinned than the Caucasian parent and lighter skinned than the African-American parent, though this is not necessarily so. The court takes judicial notice of this common knowledge. Two children of the same Caucasian mother and same African-American father would be even less likely to both look Caucasian than just one such child. These facts cannot be ignored just because they are not on paper, or because they may indeed be uncomfortable to discuss. The color of the children and the adult parents/parties is in their skin and on their faces for all to see. That reality is very significant for purposes of this motion to dismiss affecting the lives of real children.
Furthermore, in this case, the court has been advised that Mr. and Mrs. G. have a third child, younger than the two subject girls. This third child may well appear Caucasian and thus like one would normally expect a biological child of Mr. and Mrs. G. to appear, setting up yet another contrast in apparent races within the G. household and family. While any one or more of these three children could be adopted, a ward under a guardianship, a foster child, etc., if any of them look like they are not Caucasian, the question of who are the parents is simply always an obvious one, even if unspoken.
The Attorney for the Children reports that the elder daughter, at age five, expressed being distressed about the petitioner/ Mr. Damien essentially interfering via litigation with her family. No such similar concern was reported for the four year old. Indeed both children are far too young to deal with all the obvious questions created by the facts here, including the issues of race and biology. While the legal father, Mr. G., stands to lose his legal rights as father if the petitioner is declared the biological father of the children, nothing will change on a daily basis *250 so long as the G.s continue to be a couple living together. Clearly the children cannot be protected from having to recognize at some point that they cannot have two biological fathers. Nor can they be protected from recognizing that Mr. Damien is not their biological father if indeed Mrs. G. is their biological mother. Indeed, Mr. and Mrs. G. appear to have accepted this reality by allowing the petitioner to act as a father with visitation rights and child support obligations. If Mr. Damien were not in the picture, the girls would still have to recognize — at some point— that either Mr. G. or Mrs. G. is not their biological parent. The court has no magic wand to change these realities.
Obviously the children will go to school and be seen in public with Mr. and Mrs. G., and assumptions will be made. Many people, adults and children alike, would conclude that either Mr. or Mrs. G. adopted them, just based on looking at the G.s and the two girls. However, since Mr. Damien has been visiting the kids, paying child support, and being called “Daddy,” the rational conclusion based on these particular facts in addition to the apparent race of the children and adult parties, is that the adults all believe that Mr. Damien is the biological father of these two girls, who were born out of wedlock despite an intact marriage.
Mixed race children born both in and out of wedlock are very common in our modern culture. Indeed, the President of the United States, having a white mother and an African father, is such a mixed race person. Significantly, he is generally seen in our culture as black, or mixed race, or African-American — but not Caucasian. So it will probably be for these two girls when they grow up, and as they grow up. They will not be seen as the Caucasian children of two Caucasian parents. The children themselves will know, sooner or later, that they appear to even casual observers of the G. family to be mixed race children. Hopefully they will know and believe and be taught that that is just fine — as it is fine.
Dismissal Versus Denial of Genetic Marker Test
As indicated above, the Attorney for the Children has asked that the petitioner’s petition be dismissed. The typical motion made in paternity cases is to seek to block the ordering of a genetic marker test based on the children’s best interests for equitable estoppel reasons (or because of a marital presumption of paternity), not to dismiss a petition for a declaration of paternity and order of filiation. By seeking dismissal rather than just to *251 prevent the ordering of a decisive genetic marker test, the children’s attorney is seeking to avoid a hearing at which there would be testimony by all three parties as to who is the biological father even if there were no genetic marker test results to be introduced in evidence. A dismissal at this point would be a drastic granting of relief not expressly authorized by the genetic marker test statute. What is sought is no test, no testimony— instead, throw the petitioner out of court.
It seems likely that the evidence at a hearing, even without a genetic marker test, would be compelling that petitioner is the father of the two subject girls. Indeed, based on the proceedings to date in this case, the court can reasonably conclude that the history of the children’s consensual relationship with the petitioner would be established at a hearing, apparently without any significant factual dispute. Furthermore, the petitioner would testify to having engaged in sexual relations with the mother and having believed he fathered the two girls with her, and to having paid child support for them which was regularly accepted by the respondents. The mother would also probably testify to having had sexual relations with the petitioner during her marriage. The mother’s husband would presumably have to testify as well about the petitioner having seen the two girls regularly via visitation, to having received child support from petitioner, to knowing that the girls call petitioner “Daddy” too, etc. The petitioner would undoubtedly seek to introduce racial evidence in support of his case. A fact-finding hearing regarding paternity would include a search for the truth as to the fact of paternity, even though the ultimate goal in a custody/visitation matter is to determine what is in the children’s best interests.
No case cited by the Attorney for the Children is on point to require dismissal here. Family Court Act § 532 requires no genetic marker test to be ordered if the court finds that is not in the best interests of the children based on (1) presumption of legitimacy, (2) res judicata or (3) equitable estoppel. No one but the Attorney for the Children has submitted case law.
Regarding presumption of legitimacy, given that there is no question raised as to who the mother is, the marital presumption of legitimacy is obviously rebutted by the children in question not appearing Caucasian and by all the visitation and child support related behavior of the adults regarding the two girls. In reality, these children appear presumptively not to be legitimate in the biological sense though they are legally legitimate.
Matter of Weaver v Durfey (93 AD3d 1185 [4th Dept 2012]) is arguably the closest case on point because it resulted in a dis *252 missal and had some similar facts (not involving race); but the dismissal was based on res judicata — an issue not involved in this case as there have been no prior adjudications. In Weaver, the man who was the biological father pursuant to a genetic marker test discontinued his prior appeal in a paternity action in which he sought to be named the father. When he brought a new action for visitation rights, after getting genetic marker test results (by consent) giving him a 99.99% likelihood of being the father but being denied the informal visitation he had allegedly been promised, the new case was dismissed based on res judicata. Clearly the warning in Weaver is that the biological father should not have abandoned his appeal.
As to equitable estoppel, this court finds that equitable estoppel should not bar genetic marker tests because the adults and children have all along acted as if Mr. Damien is in fact the biological father. The G.s themselves acted prior to this litigation as if it were in the girls’ best interests to know the petitioner and be a part of his life. Using litigation to try to deprive Mr. Damien of his rights to them might ultimately deprive the children of a father they truly need, and extended family they need, to grow up happy, healthy and well-adjusted. It is impossible to predict the future in this regard. As stated by Chris Hayes, MSNBC commentator, “race is a social construction, not something out there in the world, but something we as a society create the rules, rhetoric and identities for.” (Chris Hayes, Up w/ Chris Hayes, White Identity Politics Doomed 2012 Republican Effort, http://tv.msnbc.com/2012/11/10/whiteidentity-politics-doomed-2012-republican-effort/ [Nov. 10, 2012].) Mr. Damien may prove critical to help the girls navigate the rules, handle the rhetoric and be themselves. Furthermore, without regard to race, it could well be that it is in the best interests of the children simply to know that they have a biological father and a day-to-day father, both of whom love them.
While one can of course argue it is still in the children’s best interests not to scientifically and decisively identify the petitioner as the biological father, this court disagrees with that argument for all the reasons stated above — and would deny the petitioner neither the test nor the testimony. He should have both, if needed to resolve this matter.
Thus, for the reasons set forth above, it is ordered that the motion to dismiss is denied; and it is further ordered that the motion alternatively for a hearing to determine whether a genetic marker test is in the children’s best interests is denied, *253 unless a specific request is made therefor within 10 days of service of a copy of this decision as set forth above.

. Stephanie Cervoni et al., Symposium on the Emerging Issues in the Rules of Evidence: Federal and New York, New York Law of Evidence, 9 St John’s J Legal Comment 289 (fall 1993).

. Domestic Relations Law § 24 (1) states in its pertinent part that “[a] child heretofore or hereafter born of parents who prior or subsequent to the birth of such child shall have entered into a civil or religious marriage ... is the legitimate child of both birth parents . . . .”

. This court has never had to hold a hearing on the issue of paternity and has presided over scores of cases in which genetic marker test results have been received.